UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

KHADIJA DUMA,

    Plaintiff

VS.                          CIVIL ACTION NO <u>1:08-cv-00581 JDB</u>

UNUM Provident,
Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson,

    Defendants

## MOTION FOR DEFAULT JUDGMENT AGAINST FANNIE MAE, DROR OPPENHEIMER, KAREN MYCHALUS, VERNA ROBINSON

COMES NOW the movant, Khadija Duma, asking this Honorable Court (Court) to grant a default judgment to her as relief against Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson (the Fannie Mae Defendants). The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) have been docketed as being in default in this Court as regards my civil action against them due to their inexcusable failure to file a timely answer to my complaint against them, per the rules of

1

this Court. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) failed to request an extension of time to file their answer to my complaint against them, and no extension of time was granted to them to file an answer to my complaint against them. I walked with great difficulty and intense pain the day that I came to this Court to file my complaint pro se against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson). I sacrificed money that my son and I need to survive to pay the complaint filing fee. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) had the ability to file their answer to my complaint electronically from almost anywhere, at almost any time, by almost anybody in their legal division; they have a legal division. Fannie Mae profits are up, but even if the profits were not up it would not have cost them a dime to file a timely answer to my complaint. The foul behavior of the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) have cost me and my son everything; yet, until now their vicious, hostile, unlawful, bad faith, retaliatory actions against me have cost them nothing.

Movant, Khadija Duma, requests a default judgment against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in the amount of thirty million dollars with treble damages and/or punitive damages added to the thirty million dollar amount.

The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) committed unlawful, retaliatory, hostile, bad faith and harmful action against movant. Specifically, the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer,

Karen Mychalus, Verna Robinson) (1) violated the Employee Retirement Income Security Act (ERISA), (2) violated movant's constitutionally-guaranteed first amendment right of freedom of speech, (3) violated the Sarbanes-Oxley Act (SOX), criminal and/or civil whistleblower provision(s), (4) civil RICO, (5) violated my civil rights (specifically under, but not limited to, the Americans with Disabilities Act, and (6) discriminated against me based upon my race, gender, and age (EEOC).

I did my job well and was punished for it. I did my job well even under the grueling, debilitating conditions the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) used to beat me down. I used to believe that the myth of Sisyphus was, indeed a myth; however, after the beat down I have received from the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) I have begun to rethink the myth part of that fable.

The Office of Federal Housing Enterprise Oversight (OFHEO) and the US Securities and Exchange Commission SEC) sanctioned Fannie Mae for many of the same misdeeds I internally and externally blew the whistle about (to my detriment). Fannie Mae recently entered into an agreement with the SEC to reimburse money to current and former Fannie Mae related to Fannie Mae mishandling of benefits. I received a reimbursement check from them for about thirty dollars with an explanation regarding this agreement. Although all money is a lot of money to me today, and when I received the thirty dollars I was grateful. Still, that thirty dollars in no way shape or form compensates me for the vile behavior I have suffered as a direct result of the actions taken by the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson). to In

Pursuit of Fannie Mae's agenda against me the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) created such a hostile work environment for me that I could not have survived it even if I had not been ill.

## SUMMARY

1.) The first time that I met Dror Oppenheimer was in a division-wide meeting he setup for a first-time "meet and greet" (he had been newly assigned to takeover our division). The meeting was held in the cafeteria which, with few exceptions, was equipped with hardback plastic chairs. I was sitting in a booth to give my back support and he came over to me to tell me to move to one of the hardback plastic chairs. I told him that I had severe back and leg problems which prevented me from sitting in the hardback plastic chairs and that I needed the support offered to me by sitting in the booth. Karen Mychalus and Verna Robinson already knew that I had serious health problems.

2.) The Americans with Disabilities Act (ADA) protection was applicable to all action taken by the Fannie Mae Defendants against me due to my disability from the point that they knew I had a disability. Karen Mychalus and Verna Robinson insisted that I attend marathon meetings although they knew that I could not sit for lengthy periods of time and that my constant getting up and moving about (given to me as a direction by Karen Mychalus) during these meetings in an attempt to relieve my discomfort caused other employees to become disgruntled with what they viewed as deliberate distractions by me. "The ADA directs the EEOC to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII of the Civil Rights Act of 1964 when enforcing ADA's prohibitions against employment discrimination on the basis of disability. Following the 1991 amendments to Title VII, the EEOC has authority to bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages, in both Title VII and ADA actions. Thus, these statutes unambiguously authorize the EEOC to obtain the relief that it seeks...Neither the statutes nor [sic] cases suggest that the existence of an arbitration agreement between private parties materially changes the EEOC's statutory function or the remedies otherwise available. *EEOC v. Waffle House, Inc.* (534 U.S. 279 (2002). My EEOC complaint was filed in a timely manner. Problems internal to the commission office that I dealt with prevented my claim from righteously going forward. The error on the part of the EEOC was not harmless error for me. After telling me that he would send my claim against Fannie Mae forward Silvio Fernandez later reneged and said that it was too late for the claim to go forward even if I

4

corrected the errors the EEOC made in the original charging document, signed it, and sent it back to him. Equitable tolling is applicable.

3.) The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) repeatedly demonstrated their intent to prevent me from benefiting from the right of disability coverage, and to make my time spent on disability as much of a hardship as the disability itself has been. The ability to lie and rewrite history is sometimes a desirable skill set at Fannie Mae. Why did Fannie Mae, during my employment with them, have a long-term benefits program with a company such as UNUM that did not provide rehabilitative services for anyone other than mechanics? (I received that information directly from the head of the rehabilitative group, Richard Hall, when I frequently and actively sought rehabilitative assistance, to no avail, within UNUM).

4.) As the insured I am at a distinct disadvantage in filing all matters associated with this motion and the original complaint pro se. I have tried unsuccessfully to hire an attorney to handle this matter; however, without the funds necessary to pay an attorney a retainer I would have had to sign over such a significant percentage of the monies owed to me that the end result would have been that I still would not have enough to buy my medicine, pay for medical insurance and keep my household running. To pay the filing fee for the complaint I had to not pay some of my household bills, but since I may not have a roof over my head soon anyway I decided to risk it. Any victory experienced by the restoration of benefits (past, present and future) would have been muted by the amount I would have had to turn over to an attorney. A victory in principle only while absolutely necessary for me would not be a victory in reality, if I had to turn over the money that I need to survive to an attorney who accepted the case on an unbelievably profitable contingency for that attorney; I am already drowning with homelessness for my son and I imminent.

5.) The United States Social Security Administration (SSA) has determined that I am totally disabled and they do not expect improvement in my disability; a fact already known by Fannie Mae. While I was actively working at Fannie Mae Dror Oppenheimer, Karen Mychalus, Verna Robinson and the human resources department at Fannie Mae, specifically Lisa Kober, all knew that I had serious health problems. They knew that, as a direct result of my health, I was struggling to keep going to meet their project deadlines (I never missed a deadline or had a failed project that I shepherded from cradle to grave). They conveyed to me that vacation and time off could impact priority schedules, so I had to give up doctor's appointments and vacation time while they all took vacation and time off. In his theory of existentialism (some say fatalism) Jean Paul Sartre claimed that because slaves had free will they did not have to be slaves; they could have taken their own lives (many slaves did take their own lives rather be slaves and they took the lives of their children as well). The work environment the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) made for me could not have

> been analogous to a Middle Passage slave ship, but it certainly made me feel as though I was not far removed from a plantation.

SSA scrutinized my application for Social Security Disability benefits on the local level and then sent all of my medical files along with my application to their regional review unit for a much more detailed review before making a final determination granting me benefits. They reviewed my case again not so long ago; my total disability was affirmed. This determination was based upon the same medical information made available to UNUM when it denied my benefits.

I have borrowed money from predatory lenders, borrowed money from friends (and former friends). I am currently trying to sell all of my material possessions to have a place to live. I have spent money that I needed for medicine all in an effort to keep a roof over our heads. I have become more ill due to the lack of medication and follow-up care, stress and depression from my disability and the loss of my disability benefits. I now stand to lose my house, my health and perhaps, my life as a result of this inequity. The last prescription I received has a side effect that may cause thoughts of suicide. The small income that I receive is not even enough to cover my subsistence, but without it I would have nothing.

6.) I have had additional diagnostic testing in an attempt to find out why I still have the symptoms that I had prior to the invasive cervical surgery with donor bone, titanium plate fusion. The lower back pain has not been sufficiently addressed, and, therefore, no reasonable assumption could be made that the problem was resolved. While UNUM seems to have limited focus in this matter, there were several symptoms documented as primary and secondary causations for my disability all of which are still outstanding.

7.) While technically, so I am told, the invasive cervical surgery with donor bone, titanium plate insertion and fusion that I reluctantly agreed to, due to coercion from Fannie Mae (Karen Mychalus and Verna Robinson), was a success it did not relieve me of the symptoms. I sought alternatives to the invasive surgery because

of the risks to me including a birth defect in my heart. I went to acupuncture, massage therapy, physical therapy, alternative medicine and pain management, but the symptoms continued. Mychalus and Robinson were unrelenting in their insistence that I have the surgery and return to Fannie Mae as soon as possible, While I was on short-term disability (STD) the supervising nurse at Fannie Mae was similarly insistent that I have the surgery. If I was performing at such a poor level, as Mychalus and Robinson asserted, why would they want me to hurry up and have the surgery so that I could hurry up and return to Fannie Mae? The second opinion by Dr. Linehan (orthopedic surgeon) suggested that the surgeries that were recommended might not relieve me of the symptoms. The bony spurring that I had prior to the surgery which Dr. Yu said was causing some of my symptoms still exists as evidenced by recent diagnostic examination. I have also been experiencing spontaneous swelling in my left leg which prevents me from bending it or walking on it at times; these symptoms are accompanied by tremendous pain. Dr. Mboijana sent me to have an ultrasound to try to determine the cause; to date there is no ready explanation for the cause of the spontaneous swelling or the original symptoms. I had an EMG prior to Dr. Nevaiser's (George Washington University Hospital Medical Faculty, chief of orthopedic surgery) examination of me. Dr. Nevaiser read the EMG results and examined me. The EMG results that he examined stated that I had carpal tunnel (a pinched nerve). Dr. Nevaiser said that the EMG was wrong and that I did not have carpal tunnel. Recently, Dr. Yu ordered an EMG for me at GW Medical Faculty, however, the doctor was not able to complete the diagnostic because I could not tolerate the pain. Dr. Mboijana subsequently referred me to Dr. Philip Pulaski. Dr. Pulaski ordered another EMG (8/2004) and an MRI (8/2004). While the EMG that Dr. Pulaski ordered was painful I was able to get through it. The results of that EMG state that I do have carpal tunnel on both sides. Per the MRI, I also have bony spurring and lower back abnormality. Pain continues at a level that I cannot tolerate without medication. The medication is potent enough to dull the pain renders me unable to perform my functions at Fannie Mae. Dr. Mboijana suggested trying neurontin; however, I am vulnerable to the side effects of neurontin. After I had the prescription filled I read the accompanying information about the side effects and have chosen not to take it. In the news recently there was derogatory information about the bad side effects of neurontin. Dr. Mboijana does not believe that the carpal tunnel is the finite answer. Both he and Dr. Pulaski believe that finding a way for me to manage my pain is key. Dr. Pulaski told me that I have operable conditions, but I do not want any additional invasive procedures and he agreed with that decision. Furthermore, Dr. Mboijana has performed extensive blood testing on me and I have elevated levels of inflammation. I have been referred to doctors to pursue the inflammation and pain management; however, I cannot afford to go. I cannot afford the medicine that I need for my hypertension and pain. I cannot afford the co pays. I owe money now for copays for the examinations already performed. I do not have an income that I can survive on right now. The loss of my long-term disability payments has created an unbearable hardship for me and my family. I intended to go directly to the courts for injunctive relief, but was informed by one of the

attorneys that I consulted that I would first have to appeal UNUM's decision to deny my benefit. Well, I appealed UNUM's decision and they denied my appeal.

8.) The aquatic classes which I participated in were not a remedy for any of the symptoms that I have experienced throughout my disability. I have always indicated that the benefit to me was that while I had almost no mobility on land unless I was pumped full of pain killers, in the water I had more mobility. The added advantage to taking the classes was that it lifted some of my depression resulting from being in the house most of the time and, for the most part, spending my time outside of the house going from one doctor to another or picking up prescriptions. In the classes I found a lot of people like myself who were also struggling with disabilities. However, the classes did not relieve the pain or improve the disability once I was out of the water. Any benefit I received from the classes was temporary at best.

9.) As a Senior Business Manager, in name only, at Fannie Mae I would have been required to 1.) spend hours in meetings sitting, 2.) spend hours at a workstation typing (constant repetitive motion) on a laptop or PC workstation, 3.) spend hours performing analytical functions that mandate clarity of thought and precise attention to detail, 4.) spend hours interfacing with peers, business customers, upper-level management, 5.) produce documentation that often requires extensive research and writing, 6.) provide training that often requires standing for prolonged periods of time, and lifting very heavy computer printouts from the testing of Fannie Mae's financial systems and new lender products. I am not able to perform these functions. I went from six-figure income compensation to being below the poverty line in one fell swoop. I worked six, seven days a week in twelve, fourteen, sixteen hour days for years for Fannie Mae to obtain that level of compensation. Giving it up to collect Social Security Disability payments was not in any of my plans.

## **FANNIE MAE 101**

10.) I began working at Fannie Mae as a Senior Project Manager in a contract position. I worked for a division that was responsible for the production system that processes all Fannie Mae financial systems (including those that follow the life of mortgages and mortgage-backed securities).

11.) I remained in the contract position for over two years. I converted to a Fannie Mae fulltime employee (FTE) in June 2000 when I accepted a position as a Senior Business Manager in the mortgage operations division (Asset Development and Management (ADM) --- this division has a slightly different name now).

12.) Although as a contractor I was a "direct-report" to a Fannie Mae director I was allowed to work independently, for the most part, as a direct result of the quality of my work. During my tenure as a Senior Project Manager I never had a failed project or flawed implementation. I never missed an implementation

deadline. I always had thorough and complete testing of any changes to the production system before implementation, and all changes were thoroughly disclosed and documented.

13.) My Fannie Mae director (Brenda Crockett), the director she reported to (Vinnie DeMicco), and the Senior VP (Marty Colburn) for the group that I worked for recommended me for the Senior Business Manager position based upon the quality of the work that I had performed for them.

14.) Going to work in the mortgage operations division was a fatal mistake. I had been warned by other Fannie Mae employees not to go into that division, but I went any way.

15.) My responsibility in mortgage operations was as a process manager. I had the responsibility for testing of all new products associated with the primary loan process for Fannie Mae's financial systems prior to the products being released to lenders for public use. Upon assuming the position over the test team I discovered many incorrect practices. I bumped heads with many directors, upper level managers, test team members and others in my attempts to correct what was wrong. Many of the directors were not interested in corrections. They were interested in getting their bonuses at whatever cost. I was told that I always said, "No". My response was that I said "No" to incorrect practices, flawed implementations and lack of disclosure. Mortgage operations was and until I left on long-term disability remained a culture of "cover up" and "go along to get along". Unfortunately for me that has never been the way that I operate. They did everything they could to me to destroy my reputation and to make me fall in line. I became an inside whistleblower. When I saw practices that were incorrect I reported them to my direct-line management (Oppenheimer, Mychalus, Kathy Mull, Robinson). When I was asked or directed to do something that was incorrect I reported it to my direct-line management (Oppenheimer, Mychalus, Kathy Mull, Robinson). However, my direct-line management never supported me (Oppenheimer, Mychalus, Robinson) instead they created a hostile work environment for me. After much ugliness, and so much stress that it was affecting my health late one night I send a forty-page email to Frank Raines and Dan Mudd detailing my plight and asked for their help. I received an email reply from Dan Mudd two weeks later stating that he had asked the head of the legal department to get in touch with me (this never happened) to investigate my claims.

16.) I filed a discrimination complaint against Fannie Mae, and the charging documents (based upon race, gender and age discrimination) were supposed to be served upon Fannie Mae. However, upon receipt of the original charging document which I was supposed to sign and return to EEOC so that Fannie Mae could be served I discovered that there were so many errors in the document that I would not sign it. I tried many times to reach the man who had interviewed me, but he never returned my calls. Eventually, I went back to the EEOC office only to discover that he was no longer in that office. I spoke to two supervisors (and Silvio Fernandez) there who promised me that although the time to sign and

return the document to them so that Fannie Mae could be served had expired that under the circumstances and because I told them that I was having serious health problems they would process the complaint whenever I could get the corrections to them (this turned out to not be the truth). I spent a lot of time going back and forth with the EEOC trying to get the corrections done and the complaint processed (Fannie Mae was aware of this because I had informed them). Fannie Mae told me that they conducted their own investigation and determined there was no wrong doing on their part; but, they failed to investigate my whistleblower assertion.

17.) At the urging of human resources, specifically Lisa Kober, I went out on STD because of my health. The STD turned into long-term disability (LTD). During the STD Fannie Mae did many unethical things to me to make my life miserable including stopping my payments several times. They may have a hand in UNUM Provident's decision to terminate my LTD. Before I went out on short-term disability Fannie Mae offered me a Voluntary Separation Option (VSO). I had twenty-one days to decide whether I would take the package. There were twelve days remaining on that time limit when I went out on STD.

18.) Fannie Mae allowed a manager (Aileen Morse) to go back and change her statements regarding me so that they appeared more negative after I had already been given a performance review. Fannie Mae claimed that suddenly (after all the work that I had successfully designed, initialized, thoroughly tested and implemented) I did not have the ability to function as a senior-level employee. Fannie Mae was aware of my health problems, demanded that I work long hours, give up vacation time while others including my managers took their vacations, and neither provided promised training for the multi-million dollar projects I was responsible for nor provided support for me while I managed those projects. Yet, I still successfully completed the projects on time.

19.) Robinson was relentless in her harassment of me. She would page me constantly even paging me out of meetings that I was conducting for my projects; but, the reasons she paged me would be nonsense. Nothing that I did was right. She would contradict herself constantly in dealing with me. She would raise her voice to the point of almost screaming when talking to me. The bottom line was that she wanted me out. I had always received praise for my writing ability, and she told me that I could not write. My director (Mychalus) placed me on troubled projects to get them successfully completed on time, and I never failed. Mychalus documented in my first performance appraisal that I had tried to implement many changes to better mortgage operations; some were implemented others were not due to pressure from Fannie Mae management. Yet my director (Mychalus) and manager (Robinson) said that I could not perform on a senior-level? Oppenheimer got rid of my position, without formal notice of any kind to me, and decided that I was only a tester. However, he kept my title as senior business manager. Fannie Mae (human resources, Oppenheimer, Mychalus, Robinson) deliberately provided a misleading job description to UNUM to support UNUM's denial of my long-term disability benefits after they had been approved in an

effort to force me back into Fannie Mae long enough to question me about being a whistleblower. They provided conflicting information about my status. They told a third-party collection company (Dyck O'Neal, Inc.) that I had been terminated and that the money I had been loaned as a part of the Employee Assisted Housing (EAH) program should be collected. They told me that I was not ever eligible for EAH again. They told me that I had to return to my job because UNUM stated I was able to work as a senior business manager and I had been assigned a human resources representative to work with on coming back to Fannie Mae. The human resources representative they assigned me to work with told me that my job had been eliminated and that I had sixty days to find another one within the company or I would be terminated. Since I was not physically able to return to work and the constant strain of being told so many different things regarding my status was overwhelming stress my PCP determined that I was still totally disabled.

20.) I strengthened the testing team, taught them new skills, improved the testing process and yet I had no skills? My director (Mychalus) documented these contributions in my first performance review. Many of the complaints OFHEO has lodged against FNMA are complaints I lodged while working for Fannie Mae; but, I was punished for opening my mouth.

21.) I applied for a management position on the production-side of Fannie Mae to get out of mortgage operations. When I went to interview with the director (Vinnie DeMicco, the same person who had highly recommended me for the position with mortgage operations) he was angry with me. He said that everyone in the group that I used to work with on the production side was upset with me because I had disclosed failings in the loan processing in the primary financial system (which I should have done because it was part of my job). He told me that I should have come to him instead of revealing the weaknesses to mortgage operations. His friends in mortgage operations shot me down on it anyway. He once approached me in the cafeteria and told me that I thought that just because something was the truth that I could just say it. He was absolutely right. He browbeat me so badly that as soon as I left the "interview" I went to the nearest telephone outside his office, called human resources to see what I had to do to withdraw my application for the position, was told by human resources that since that group did their own hiring I would have to let the director who interviewed me know that I was withdrawing my application for the position, I said, "okay" and went to the nearest desktop workstation outside his office, signed on and immediately sent him an email stating that I was withdrawing my application for the management position (all of this information was provided to Frank Raines and Dan Mudd in the email that I sent to them).

22.) After OFHEO's first hit against Fannie Mae the legal department at Fannie Mae had someone call me about my whistleblower assertion in the email that I sent to Frank Raines and Dan Mudd. She left a message for me, however since I was out on STD I never returned the call in keeping with Fannie Mae policy at that time.

23.)   While I was brutalized for speaking out at Fannie Mae I told friends about the problems I was having as a whistleblower. A buddy, at that time, was also an administrative law judge within the US Securities and Exchange Commission. She has since retired. Although she was not in enforcement I always assumed from our conversations that she shared the information that I passed along to her regarding Fannie Mae with her colleagues.

I ask this Court to grant my motion for a default judgment in the amount of thirty million dollars against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in (1) violation of the Employee Retirement Income Security Act (ERISA), (2) violation of my constitutionally-guaranteed first amendment right of freedom of speech, (3) violation of the Sarbanes-Oxley Act (SOX), criminal and/or civil whistleblower provision(s), (4) civil RICO, (5) violation of my civil rights (specifically but not limited to the ADA, and (6) discrimination against me based upon my race, gender, and age (EEOC). Movant also seeks punitive and/or treble damages from the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) as a remedy for their vicious actions against me.

I am financially ruined. My son and I are going to end up living on a grate in the nation's capital because I did my job and tried to prevent some of the madness we are now experiencing in the mortgage industry. My destruction is my reward. Fannie Mae and Bear Stearns helped to create the madness we are now experiencing in the mortgage industry. Their reward is a bailout and opportunities to make more money.

*Khadija Duma* (signature)

Khadija Duma
1840 Massachusetts Ave., SE
Washington, DC 20003
(202) 546-6281

## CERTIFICATE OF SERVICE

I, Khadija Duma, certify that on this 8th day of May, 2008 I mailed first class (certified mail/return receipt requested) a copy of the foregoing to the following:

Counsel for the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson):

Attn: Damien G. Stewart
Fannie Mae Legal Department
3900 Wisconsin Avenue, NW
Washington, DC 20016

Counsel for UNUM Provident:

Attn: Mary C. Zinsner
Troutman Sanders LLP
1660 International Drive (Ste. 600)
McLean, VA 22102


_____
Khadija Duma
1840 Massachusetts Ave., SE
Washington, DC 20003
(202) 546-6281