UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

RECEIVED

MAY 2 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

KHADIJA DUMA,

**Plaintiff**

VS.                          CIVIL ACTION NO <u>1:08-cv-00581 JDB</u>

UNUM Provident,
**Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson,**

**Defendants**

---

## SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST FANNIE MAE, DROR OPPENHEIMER, KAREN MYCHALUS, VERNA ROBINSON

COMES NOW the movant, Khadija Duma with a Supplemental Memorandum of Points

and Authorities in support of plaintiff's request to this Honorable Court (Court) to

expedite and to grant a default judgment to her as relief against Fannie Mae, Dror

Oppenheimer, Karen Mychalus, Verna Robinson (the Fannie Mae Defendants). The

Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna

Robinson) have been docketed as being in default in this Court as regards my civil action

1

against them due to their inexcusable failure to file a timely answer to my complaint against them, per the rules of this Court. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) failed to request an extension of time to file their answer to plaintiff's complaint against them, and no extension of time was granted to them to file an answer to plaintiff's complaint against them. Counsel (Damien G. Stewart and Madonna McGwinn from Fannie Mae's legal division) entered their appearance on behalf of the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in response to my complaint against Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson.

I walked with great difficulty and intense pain the day that I came to this Court to file my complaint pro se against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson). I sacrificed money that my son and I need to survive to pay the complaint filing fee. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) had the ability to file their answer to my complaint electronically from almost anywhere, at almost any time, by almost anybody in their legal division; they have a legal division. Fannie Mae profits are up, but even if the profits were not up it would not have cost them a dime to file a timely answer to my complaint. The foul behavior of the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) have cost me and my son everything; yet, until now their vicious, hostile, unlawful, bad faith, retaliatory actions against me have cost them nothing.

Movant, Khadija Duma, respectfully requests a default judgment against the Fannie Mae

Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in the amount of thirty million dollars with treble damages and/or punitive damages added to the thirty million dollar amount. Movant is egregiously harmed by further delay in granting her motion for a default judgment against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in the amount of thirty million dollars with treble damages and or punitive dames added to the thirty million dollar amount, should be granted an immediate default judgment against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson). The survival of my son and I depends on it. I have attached many exhibits to this supplemental memorandum in support of this motion. I have more, but could not carry more to get copies, then get to the clerk of the court's office, and then to mail copies to counsel for the defendants. I could not find rules on for the Court regarding how I should attach them as a pro se plaintiff so I have handwritten numbers on them.

A.) The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) committed unlawful, retaliatory, hostile, bad faith and harmful action against movant, Khadija Duma. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) have deliberately and repeated lied regarding the Voluntary Separation Option that was offered to me by Fannie Mae (when it was offered, what action I allegedly took when it was offered, when I stopped working, and the reasons why it was offered). I initially went on short-term disability at the suggestion of Human Resources representative, Lisa Kober. In an effort to save my livelihood I returned to work on or about June 2, but I was told to go home by Lisa Kober

and the nurse because I was not well enough to work . Lying and rewriting history is a skill set at Fannie Mae.

In corporate America it is almost impossible to survive as a whistleblower. It basically comes down to pay your mortgage/rent or do the right thing. In corporate America as an African American woman who is disabled, mature and a whistleblower I was an easy target. There are several cases before the U.S. Supreme Court now that deal with age discrimination. UNUM Provident and Fannie Mae have stolen my ability to make and living and stay in the workforce as a disabled, mature woman. I have sent out hundreds or resumes, and attended countless job fairs with no chance it seems of ever recovery what they illegally took from me. Fannie Mae boasts in press releases to the public that it is a diverse company and diversity is valued within the company. That is not the truth of the matter. The forms that are filled out and submitted so that Fannie Mae could be voted a diverse company and one of the best places to work were filled out by the human resources and diversity teams within Fannie Mae management. The internal surveys taken from employees were rife with complaints about discrimination and inequities. The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) claimed that I had deficiencies in my knowledge of the mortgage operations division that affected my performance. Yet, by their own admission the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) state that I satisfactorily completed all of my projects and they continuously placed me on projects that were troubled so that I could successfully complete them (some of these projects had been stagnant for a year or more (e.g., the project manager for AABW could not even get most of the team to attend meetings or communicate with her before I became involved, it had been in a state of inertia for a year/ FRC was deeply

troubled and two months behind when I was hired and before I became involved) as the

direct result of assignments made to me by the Fannie Mae Defendants (Fannie Mae, Dror

Oppenheimer, Karen Mychalus, Verna Robinson).  No project that I managed from cradle to

Grave failed.  The only flawed projects I was ever involved with were those that were

Troubled long before I became involved and management refused to take the corrective

action I recommended to make full disclosure and maintain the integrity in the project.  I

refused to signoff on projects that were flawed, and I refused to remain silent regarding the

outstanding problems/issues with flawed projects; that marked the beginning of the end

for me with the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen

Mychalus, Verna Robinson).  Yet, white men and women (young and old) who were loud

and angry (I was not), verbally abusive (I was not), recalcitrant (I was not), would refuse

assignments (I did not) when they did not agree with project assignments or management

decisions regarding projects were indulged (I was not).  I was often sick and immobile as

a direct result of the added pressure and stress of these projects; in addition to the fact

that I often missed my doctors' appointments for treatment of my disability because I had

to meet the deadlines set for me by the Fannie Mae Defendants (Fannie Mae, Dror

Oppenheimer, Karen Mychalus, Verna Robinson) or I risked losing my job.   Fannie Mae

has one of the largest telecommuting (telework) communities in corporate America.

When I was first hired by Karen Mychalus I told her I preferred to work only in

Washington, DC.  Mychalus told me that if I took the position as Senior Business

Manager I would only be in Herndon, VA for three months and then I would be moved

back to Washington, DC to the location at 4250 Connecticut Avenue, NW.  Mychalus

gave me three telework days a week which I could use to either work from home or work

from the corporate office in Washington, DC, 3900 Wisconsin Avenue, NW. I lived on

Capitol Hill and my preference was to work from home because of my health (employees

as a matter of Fannie Mae policy were allowed to work from home just because they did

not want to drive to Herndon, VA five days a week; employees were allowed to buy

homes in other parts of the country and telework to the Herndon, VA or Washington, DC

offices---they were not required to be physically present in VA or DC at anytime). Yet,

although I was given the three days For telework from home Mychalus was not satisfied

unless I was on the premises at Corporate on Wisconsin Avenue in Washington, DC

which somewhat defeated the benefit to me of not having to commute since it took as

long to get across town in rush-hour traffic as it took for me to get to Herndon, VA in

rush-hour traffic. Although I never failed to complete my projects eventually my

telework days were taken from me completely. The Fannie Mae Defendants (Fannie

Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) knew that that I had health

problems and the commute to Herndon, VA was difficult for me, but they continued to

provide telework days for others, but not for me. They just kept piling the work on me.

Karen Mychalus knew that I was not familiar with Fannie Mae mortgage operations when

she hired me. She promised me training and personalized sessions with her that would help

bring me up to speed. The only training I received was the training that I sought for myself;

and, the only training session I missed was the one I was told my testing schedule would not

permit me the time to take off to attend it. I was not offered telework, reduced hour week, or

any other accommodation to help facilitate my return to work at Fannie Mae after they, in

cahoots with UNUM Provident, decided that I could return to work although by and through

their own documentation there was no job for me to return to. Actually, according to their

6

game plan there was a constructive discharge, as the direct result of the harassment, discrimination, lack of quality assignments, lack of equitable merit increases and violation of my civil rights prior to the date Fannie Mae lists as my termination date. The discrimination I suffered at Fannie Mae was sufficiently pervasive enough to alter the conditions of my employment in the terms, conditions and privileges. My job performance was factually superior to many who were consistently awarded bonuses and merit awards which were often based upon the successes of my projects and my efforts. The Fannie Mae Defendants offered a Performance Improvement Plan in bad faith. They had already made the decision to terminate me as evidenced by the timeline they mistakenly included in the Voluntary Separation Option(VSO) package that they offered me (I have included this timeline as one of the exhibits attached to this supplement. "*Pennsylvania State Police v.Suders*, 325 F. 3d 432 (3d Cir 2003), cert. granted, No. 03-95, 2003 U.S. Lexis 8576 bars an employer from using Ellerth (*Burlingnton Industries v. Ellerth*, 524 U.S. 742 (1998), and Faragher (*Faragher v. Boca Raton*, 524 U.S. 775 (1998)) special affirmative defense only if their supervisors have not taken a tangible employment action. If, however, a tangible employment action has occurred the employer is automatically liable for the harassment..." (Nixon Peabody) Verna Robinson did not like women who were not submissive working under her. I was her subordinate, and I was not insubordinate. Still, I was not submissive. She showed preferential treatment to those women working for her accepted her dominance to their submission, and she wasn't kidding (because there was never any kidding between Dror Oppenheimer, Karen Mychalus, Verna Robinson and me) when she made me aware of that fact. Her preferential treatment for women who accepted a submissive position to her dominance is illegal as stated in *Oncale v. Sundowner Offshore Services, Inc.*, 1185 S. Ct.

998 (1998). UNUM Provident and Fannie Mae caused me to loose my benefits, my income, and my ability to make future income (and now subsequently my home which is the only shelter my son and I have), and they collaborated to make these events actionable destruction in my life to keep my claims against Fannie Mae silent. For me the Fannie Mae workplace was permeated with discriminatory actions against me, intimidation, ridicule and insult. I did my job well. I worked as part of the team. However, more often than not, the team's goal, as defined by Fannie Mae, Dror Oppenheimer, Karen Mychalus and Verna Robinson was to meet a deadline that would lead to monetary bonuses or reward (almost always for everyone but me). Verna Robinson referred to these bonuses and rewards as the "golden handcuffs". She said the money was the reason everybody stayed employed at Fannie Mae so long and the reason everybody, by consensus, went along with group decisions to meet deadlines even if the lender products and/or financial system modifications were flawed. She said the key was to meet the deadline dates and reap the reward. I was disrupting the cart by insisting on best practices, integrity in the financial system testing process of modifications to those systems, automation of those systems which would prevent manual manipulation of financial system test results, and flawless implementations. Verna Robinson called me "the soup of the day." When I asked her what that meant she said that she was going to eat me up. Karen Mychalus told me that I could be a star at Fannie Mae (Verna Robinson later repeated this to me), but I would have to learn to go along to get along (which included allowing flawed financial systems to be implemented while signing off on their modifications as satisfactory; I would not do it). Complaints that I would not signoff and allow manual manipulation of data for financial system test results, financial system code changes that were risky, "on-the-fly" and undocumented, lack of disclosure to

8

all stakeholders, flawed implementation of financial system changes (just to meet a deadline

so that someone in management could get their bonus), lack of accountability for

undocumented changes to the financial systems caused constant harassment to me. I was

fair, but that wasn't enough. I was summoned to a meeting in Dror Oppenheimer's office

where I met with Dror Oppenheimer, Karen Mychalus, and Verna Robinson. I was told

specifically by Oppenheimer, on the recommendation of Mychalus and Robinson, to back off

and leave the business analysts, programmers, managers, third-party vendors, etc. alone to

make the changes and mistakes that they were comfortably accustomed to making. The

Office of Federal Housing Enterprise Oversight (OFHEO) and the US Securities and

Exchange Commission SEC) sanctioned Fannie Mae for many of the same misdeeds I

internally and externally blew the whistle about (to my detriment). OFHEO and the SEC

later sanctioned and fined Fannie Mae for doing what, in many cases, I tried to prevent.

UNUM Provident and Fannie Mae stripped me of my constitutional right to earn a living. I

have tried many times to reach an amicable settlement with Fannie Mae and UNUM

Provident, without success, that would keep my son and I out of the position we now find

ourselves in.

B.) The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus,

Verna Robinson) (1) violated the Employee Retirement Income Security Act (ERISA) by

providing a false job description to UNUM Provident which UNUM relied heavily upon

to determine that I was able to return to work. The Fannie Mae Defendants provided

UNUM with a generic, vague job description which could be used as a template to begin

a job description which would leave one to believe that I only had to make decisions and

oversee work by others, in a leisure manner, in a financial institution; and, as I was told
by UNUM, at the time that they denied my appeal of the termination of my benefits, how
difficult could being a Senior Business Manager be? I was not a Senior Business
Manager. Dror Oppenheimer kept my payroll title and official title as that of a Senior
Business Manager when in fact he demoted me, without any formal notice, to the
position of a tester which he, Karen Mychalus and Verna Robinson euphemistically refer
to as a Senior Business Analyst with completely different duties from those of a Senior
Business Manager. As a tester I would have had to lift financial system computer
printouts that were sometimes so heavy we had to move them by mobile carts. We had to
refer back to stacked boxes of archived financial reports which involved very heavy
lifting and moving of boxes. I would have had to spent hours keying, detailed
information into testing material (test scripts, etc.), I would have had to sit in front of a
computer work station for hours at a time. Verna Robinson and Karen Mychalus used to
tell me that I was the most mature (oldest) member on the team and that I should show
them what thirty years of experience looked like (Verna once made that comment in
anger at me in her office in the presence of Lisa Kober, our human resources
representative). Test team members were constantly asking me how old I was. They
used to openly guess and try to calculate my age based upon other information that had
about me (i.e., the age of my son). I did not think that it was any of their business and
told them so; (2) violated movant's constitutionally-guaranteed first amendment right of
freedom of speech; (3) violated the Sarbanes-Oxley Act (SOX), criminal
and/or civil whistleblower provision(s); (4) civil RICO; (5) violated my civil rights
(specifically under, but not limited to, the Americans with Disabilities Act; and (6)

10

discriminated against me based upon my race, gender, age, and disability (EEOC).

I did my job well and was punished for it. I did my job well even under the grueling, debilitating conditions the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) used to beat me down. I used to believe that the myth of Sisyphus was, indeed a myth; however, after the beat down I have received from the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) I have begun to rethink the myth part of that fable.

Fannie Mae recently entered into an agreement with the SEC to reimburse money to current and former Fannie Mae related to Fannie Mae mishandling of benefits. I received a reimbursement check from them for about thirty dollars with an explanation regarding this agreement. Although all money is a lot of money to me today, and when I received the thirty dollars I was grateful. Still, that thirty dollars in no way shape or form compensates me for the vile behavior I have suffered as a direct result of the actions taken by the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson). to In Pursuit of Fannie Mae's agenda against me the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) created such a hostile work environment for me that I could not have survived it even if I had not been ill.

## SUMMARY

1.) The first time that I met Dror Oppenheimer was in a division-wide meeting he setup for a first-time "meet and greet" (he had been newly assigned to takeover our division). The meeting was held in the cafeteria which, with few exceptions, was equipped with hardback plastic chairs. I was sitting in a booth to give my back support and he came over to me to tell me to move to one of the hardback plastic chairs. I told him that I had severe back and leg problems which prevented me from sitting in the hardback plastic chairs and that I needed the support offered

11

to me by sitting in the booth. Karen Mychalus and Verna Robinson already knew that I had serious health problems.

2.) The Americans with Disabilities Act (ADA) protection was applicable to all action taken by the Fannie Mae Defendants against me due to my disability from the point that they knew I had a disability. Karen Mychalus and Verna Robinson insisted that I attend marathon meetings although they knew that I could not sit for lengthy periods of time and that my constant getting up and moving about (given to me as a direction by Karen Mychalus) during these meetings in an attempt to relieve my discomfort caused other employees to become disgruntled with what they viewed as deliberate distractions by me. "The ADA directs the EEOC to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII of the Civil Rights Act of 1964 when enforcing ADA's prohibitions against employment discrimination on the basis of disability. Following the 1991 amendments to Title VII, the EEOC has authority to bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages, in both Title VII and ADA actions. Thus, these statutes unambiguously authorize the EEOC to obtain the relief that it seeks...Neither the statutes nor [sic] cases suggest that the existence of an arbitration agreement between private parties materially changes the EEOC's statutory function or the remedies otherwise available. *EEOC v. Waffle House, Inc.* (534 U.S. 279 (2002). My EEOC complaint was filed in a timely manner. Problems internal to the commission office that I dealt with prevented my claim from righteously going forward. The error on the part of the EEOC was not harmless error for me. After telling me that he would send my claim against Fannie Mae forward Silvio Fernandez later reneged and said that it was too late for the claim to go forward even if I corrected the errors the EEOC made in the original charging document, signed it, and sent it back to him. Equitable tolling is applicable.

3.) The Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) repeatedly demonstrated their intent to prevent me from benefiting from the right of disability coverage, and to make my time spent on disability as much of a hardship as the disability itself has been. The ability to lie and rewrite history is sometimes a desirable skill set at Fannie Mae. Why did Fannie Mae, during my employment with them, have a long-term benefits program with a company such as UNUM that did not provide rehabilitative services for anyone other than mechanics? (I received that information directly from the head of the rehabilitative group, Richard Hall, when I frequently and actively sought rehabilitative assistance, to no avail, within UNUM).

4.) As the insured I am at a distinct disadvantage in filing all matters associated with this motion and the original complaint pro se. I have tried unsuccessfully to hire an attorney to handle this matter; however, without the funds necessary to pay an attorney a retainer I would have had to sign over such a significant percentage of the monies owed to me that the end result would have been that I still would not have enough to buy my medicine, pay for medical insurance and keep my

household running. To pay the filing fee for the complaint I had to not pay some of my household bills, but since I may not have a roof over my head soon anyway I decided to risk it. Any victory experienced by the restoration of benefits (past, present and future) would have been muted by the amount I would have had to turn over to an attorney. A victory in principle only while absolutely necessary for me would not be a victory in reality, if I had to turn over the money that I need to survive to an attorney who accepted the case on an unbelievably profitable contingency for that attorney; I am already drowning with homelessness for my son and I imminent.

5.)  The United States Social Security Administration (SSA) has determined that I am totally disabled and they do not expect improvement in my disability; a fact already known by Fannie Mae. While I was actively working at Fannie Mae Dror Oppenheimer, Karen Mychalus, Verna Robinson and the human resources department at Fannie Mae, specifically Lisa Kober, all knew that I had serious health problems. They knew that, as a direct result of my health, I was struggling to keep going to meet their project deadlines (I never missed a deadline or had a failed project that I shepherded from cradle to grave). They conveyed to me that vacation and time off could impact priority schedules, so I had to give up doctor's appointments and vacation time while they all took vacation and time off. In his theory of existentialism (some say fatalism) Jean Paul Sartre claimed that because slaves had free will they did not have to be slaves; they could have taken their own lives (many slaves did take their own lives rather be slaves and they took the lives of their children as well). The work environment the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) made for me could not have been analogous to a Middle Passage slave ship, but it certainly made me feel as though I was not far removed from a plantation.

SSA scrutinized my application for Social Security Disability benefits on the local level and then sent all of my medical files along with my application to their regional review unit for a much more detailed review before making a final determination granting me benefits. They reviewed my case again not so long ago; my total disability was affirmed. This determination was based upon the same medical information made available to UNUM when it denied my benefits.

I have borrowed money from predatory lenders, borrowed money from friends (and former friends). I am currently trying to sell all of my material possessions to have a place to live. I have spent money that I needed for medicine all in an effort to keep a roof

over our heads. I have become more ill due to the lack of medication and follow-up care, stress and depression from my disability and the loss of my disability benefits. I now stand to lose my house, my health and perhaps, my life as a result of this inequity. The last prescription I received has a side effect that may cause thoughts of suicide. The small income that I receive is not even enough to cover my subsistence, but without it I would have nothing.

6.) I have had additional diagnostic testing in an attempt to find out why I still have the symptoms that I had prior to the invasive cervical surgery with donor bone, titanium plate fusion. The lower back pain has not been sufficiently addressed, and, therefore, no reasonable assumption could be made that the problem was resolved. While UNUM seems to have limited focus in this matter, there were several symptoms documented as primary and secondary causations for my disability all of which are still outstanding.

7.) While technically, so I am told, the invasive cervical surgery with donor bone, titanium plate insertion and fusion that I reluctantly agreed to, due to coercion from Fannie Mae (Karen Mychalus and Verna Robinson), was a success it did not relieve me of the symptoms. I sought alternatives to the invasive surgery because of the risks to me including a birth defect in my heart. I went to acupuncture, massage therapy, physical therapy, alternative medicine and pain management, but the symptoms continued. Mychalus and Robinson were unrelenting in their insistence that I have the surgery and return to Fannie Mae as soon as possible, While I was on short-term disability (STD) the supervising nurse at Fannie Mae was similarly insistent that I have the surgery. If I was performing at such a poor level, as Mychalus and Robinson asserted, why would they want me to hurry up and have the surgery so that I could hurry up and return to Fannie Mae? The second opinion by Dr. Linehan (orthopedic surgeon) suggested that the surgeries that were recommended might not relieve me of the symptoms. The bony spurring that I had prior to the surgery which Dr. Yu said was causing some of my symptoms still exists as evidenced by recent diagnostic examination. I have also been experiencing spontaneous swelling in my left leg which prevents me from bending it or walking on it at times; these symptoms are accompanied by tremendous pain. Dr. Mboijana sent me to have an ultrasound to try to determine the cause; to date there is no ready explanation for the cause of the spontaneous swelling or the original symptoms. I had an EMG prior to Dr. Nevaiser's (George Washington University Hospital Medical Faculty, chief of orthopedic surgery) examination of me. Dr. Nevaiser read the EMG results and examined me. The EMG results that he examined stated that I had carpal tunnel (a pinched nerve). Dr. Nevaiser said that the EMG was wrong and that I did not have carpal tunnel. Recently, Dr. Yu ordered an EMG for me at GW Medical Faculty, however, the doctor was not able to complete the diagnostic because I could not

tolerate the pain. Dr. Mboijana subsequently referred me to Dr. Philip Pulaski. Dr. Pulaski ordered another EMG (8/2004) and an MRI (8/2004). While the EMG that Dr. Pulaski ordered was painful I was able to get through it. The results of that EMG state that I do have carpal tunnel on both sides. Per the MRI, I also have bony spurring and lower back abnormality. Pain continues at a level that I cannot tolerate without medication. The medication is potent enough to dull the pain renders me unable to perform my functions at Fannie Mae. Dr. Mboijana suggested trying neurontin; however, I am vulnerable to the side effects of neurontin. After I had the prescription filled I read the accompanying information about the side effects and have chosen not to take it. In the news recently there was derogatory information about the bad side effects of neurontin. Dr. Mboijana does not believe that the carpal tunnel is the finite answer. Both he and Dr. Pulaski believe that finding a way for me to manage my pain is key. Dr. Pulaski told me that I have operable conditions, but I do not want any additional invasive procedures and he agreed with that decision. Furthermore, Dr. Mboijana has performed extensive blood testing on me and I have elevated levels of inflammation. I have been referred to doctors to pursue the inflammation and pain management; however, I cannot afford to go. I cannot afford the medicine that I need for my hypertension and pain. I cannot afford the co pays. I owe money now for copays for the examinations already performed. I do not have an income that I can survive on right now. The loss of my long-term disability payments has created an unbearable hardship for me and my family. I intended to go directly to the courts for injunctive relief, but was informed by one of the attorneys that I consulted that I would first have to appeal UNUM's decision to deny my benefit. Well, I appealed UNUM's decision and they denied my appeal.

8.) The aquatic classes which I participated in were not a remedy for any of the symptoms that I have experienced throughout my disability. I have always indicated that the benefit to me was that while I had almost no mobility on land unless I was pumped full of pain killers, in the water I had more mobility. The added advantage to taking the classes was that it lifted some of my depression resulting from being in the house most of the time and, for the most part, spending my time outside of the house going from one doctor to another or picking up prescriptions. In the classes I found a lot of people like myself who were also struggling with disabilities. However, the classes did not relieve the pain or improve the disability once I was out of the water. Any benefit I received from the classes was temporary at best.

9.) As a Senior Business Manager, in name only, at Fannie Mae I would have been required to 1.) spend hours in meetings sitting, 2.) spend hours at a workstation typing (constant repetitive motion) on a laptop or PC workstation, 3.) spend hours performing analytical functions that mandate clarity of thought and precise attention to detail, 4.) spend hours interfacing with peers, business customers, upper-level management, 5.) produce documentation that often requires extensive research and writing, 6.) provide training that often requires standing for prolonged periods of time, and lifting very heavy computer printouts from the testing of Fannie Mae's financial systems and new lender products. I am not able to perform these functions. I went from six-figure income compensation to being below the poverty line in one fell swoop. I worked six, seven days a week in twelve, fourteen, sixteen hour days

for years for Fannie Mae to obtain that level of compensation. Giving it up to collect Social Security Disability payments was not in any of my plans.

## FANNIE MAE 101

10.)    I began working at Fannie Mae as a Senior Project Manager in a contract position. I worked for a division that was responsible for the production system that processes all Fannie Mae financial systems (including those that follow the life of mortgages and mortgage-backed securities).

11.)    I remained in the contract position for over two years. I converted to a Fannie Mae fulltime employee (FTE) in June 2000 when I accepted a position as a Senior Business Manager in the mortgage operations division (Asset Development and Management (ADM) --- this division has a slightly different name now).

12.)    Although as a contractor I was a "direct-report" to a Fannie Mae director I was allowed to work independently, for the most part, as a direct result of the quality of my work. During my tenure as a Senior Project Manager I never had a failed project or flawed implementation. I never missed an implementation deadline. I always had thorough and complete testing of any changes to the production system before implementation, and all changes were thoroughly disclosed and documented.

13.)    My Fannie Mae director (Brenda Crockett), the director she reported to (Vinnie DeMicco), and the Senior VP (Marty Colburn) for the group that I worked for recommended me for the Senior Business Manager position based upon the quality of the work that I had performed for them.

14.)    Going to work in the mortgage operations division was a fatal mistake. I had been warned by other Fannie Mae employees not to go into that division, but I went any way.

15.)    My responsibility in mortgage operations was as a process manager. I had the responsibility for testing of all new products associated with the primary loan process for Fannie Mae's financial systems prior to the products being released to lenders for public use. Upon assuming the position over the test team I discovered many incorrect practices. I bumped heads with many directors, upper level managers, test team members and others in my attempts to correct what was wrong. Many of the directors were not interested in corrections. They were interested in getting their bonuses at whatever cost. I was told that I always said, "No". My response was that I said "No" to incorrect practices, flawed implementations and lack of disclosure. Mortgage operations was and until I left on long-term disability remained a culture of "cover up" and "go along to get along". Unfortunately for me that has never been the way that I operate. They did everything they could to me to destroy my reputation and to make me fall in line. I became an inside whistleblower. When I saw practices that were incorrect I reported them to my direct-line management (Oppenheimer, Mychalus, Kathy Mull, Robinson). When I was asked or directed to do something that was incorrect I reported it to my direct-line management (Oppenheimer, Mychalus, Kathy Mull, Robinson). However, my direct-line management never

supported me (Oppenheimer, Mychalus, Robinson) instead they created a hostile work environment for me. After much ugliness, and so much stress that it was affecting my health late one night I send a forty-page email to Frank Raines and Dan Mudd detailing my plight and asked for their help. I received an email reply from Dan Mudd two weeks later stating that he had asked the head of the legal department to get in touch with me (this never happened) to investigate my claims.

16.)    I filed a discrimination complaint against Fannie Mae, and the charging documents (based upon race, gender, disability and age discrimination) were supposed to be served upon Fannie Mae. However, upon receipt of the original charging document which I was supposed to sign and return to EEOC so that Fannie Mae could be served I discovered that there were so many errors in the document that I would not sign it. I tried many times to reach the man who had interviewed me, but he never returned my calls. Eventually, I went back to the EEOC office only to discover that he was no longer in that office. I spoke to two supervisors (and Silvio Fernandez) there who promised me that although the time to sign and return the document to them so that Fannie Mae could be served had expired that under the circumstances and because I told them that I was having serious health problems they would process the complaint whenever I could get the corrections to them (this turned out to not be the truth). I spent a lot of time going back and forth with the EEOC trying to get the corrections done and the complaint processed (Fannie Mae was aware of this because I had informed them). The fact that the local EEOC was deficient in processing my complaint against Fannie Mae should not preclude me from having a remedy here against Fannie Mae. My complaint was filed in a timely manner. Fannie Mae told me that they conducted their own investigation and determined there was no wrong doing on their part; but, they failed to investigate my whistleblower assertion.

17.)    At the urging of human resources, specifically Lisa Kober, I went out on STD because of my health. I returned to work on or about June 2 and was told by Lisa Kober and the nurse to go back home because I was too sick to work. The STD turned into long-term disability (LTD). During the STD Fannie Mae did many unethical things to me to make my life miserable including stopping my payments several times. They may have a hand in UNUM Provident's decision to terminate my LTD. Before I went out on short-term disability Fannie Mae offered me a Voluntary Separation Option (VSO). I had twenty-one days to decide whether I would take the package. There were twelve days remaining on that time limit when I went out on STD.

18.)    Fannie Mae allowed a manager (Aileen Morse) to go back and change her statements regarding me so that they appeared more negative after I had already been given a performance review. Fannie Mae claimed that suddenly (after all the work that I had successfully designed, initialized, thoroughly tested and implemented) I did not have the ability to function as a senior-level employee. Fannie Mae was aware of my health problems, demanded that I work long hours, give up vacation time while others including my managers took their vacations, and neither provided promised training for the multi-million dollar projects I was responsible for nor provided

17

support for me while I managed those projects. Yet, I still successfully completed the projects on time.

19.)    Robinson was relentless in her harassment of me. She would page me constantly even paging me out of meetings that I was conducting for my projects; but, the reasons she paged me would be nonsense. Nothing that I did was right. She would contradict herself constantly in dealing with me. She would raise her voice to the point of almost screaming when talking to me. The bottom line was that she wanted me out. I had always received praise for my writing ability, and told me that I could not write. My director (Mychalus) placed me on troubled projects to get them successfully completed on time, and I never failed. Mychalus documented in my first performance appraisal that I had tried to implement many changes to better mortgage operations; some were implemented others were not due to pressure from Fannie Mae management. Yet my director (Mychalus) and manager (Robinson) said that I could not perform on a senior-level? Oppenheimer got rid of my position, without formal notice of any kind to me, and decided that I was only a tester. However, he kept my title as senior business manager. Fannie Mae (human resources, Oppenheimer, Mychalus, Robinson) deliberately provided a misleading job description to UNUM to support UNUM's denial of my long-term disability benefits after they had been approved in an effort to force me back into Fannie Mae long enough to question me about being a whistleblower. They provided conflicting information about my status. They told a third-party collection company (Dyck O'Neal, Inc.) that I had been terminated and that the money I had been loaned as a part of the Employee Assisted Housing (EAH) program should be collected. They told me that I was not ever eligible for EAH again. They told me that I had to return to my job because UNUM stated I was able to work as a senior business manager and I had been assigned a human resources representative to work with on coming back to Fannie Mae. The human resources representative they assigned me to work with told me that my job had been eliminated and that I had sixty days to find another one within the company or I would be terminated. Since I was not physically able to return to work and the constant strain of being told so many different things regarding my status was overwhelming stress my PCP determined that I was still totally disabled.

20.)    I strengthened the testing team, taught them new skills, improved the testing process and yet I had no skills? My director (Mychalus) documented these contributions in my first performance review. Many of the complaints OFHEO has lodged against FNMA are complaints I lodged while working for Fannie Mae; but, I was punished for opening my mouth.

21.)    I applied for a management position on the production-side of Fannie Mae to get out of mortgage operations. When I went to interview with the director (Vinnie DeMicco, the same person who had highly recommended me for the position with mortgage operations) he was angry with me. He said that everyone in the group that I used to work with on the production side was upset with me because I had disclosed failings in the loan processing in the primary financial system (which I should have done because it was part of my job). He told me that I should have come to him

instead of revealing the weaknesses to mortgage operations. His friends in mortgage operations shot me down on it anyway. He once approached me in the cafeteria and told me that I thought that just because something was the truth that I could just say it. He was absolutely right. He browbeat me so badly that as soon as I left the "interview" I went to the nearest telephone outside his office, called human resources to see what I had to do to withdraw my application for the position, was told by human resources that since that group did their own hiring I would have to let the director who interviewed me know that I was withdrawing my application for the position, I said, "okay" and went to the nearest desktop workstation outside his office, signed on and immediately sent him an email stating that I was withdrawing my application for the management position (all of this information was provided to Frank Raines and Dan Mudd in the email that I sent to them).

22.) After OFHEO's first hit against Fannie Mae the legal department at Fannie Mae had someone call me about my whistleblower assertion in the email that I sent to Frank Raines and Dan Mudd. She left a message for me, however since I was out on STD I never returned the call in keeping with Fannie Mae policy at that time.

23.) While I was brutalized for speaking out at Fannie Mae I told friends about the problems I was having as a whistleblower. A buddy, at that time, was also an administrative law judge within the US Securities and Exchange Commission. She has since retired. Although she was not in enforcement I always assumed from our conversations that she shared the information that I passed along to her regarding Fannie Mae with her colleagues.

I ask this Court to grant my motion for a default judgment in the amount of thirty million dollars against the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) in (1) violation of the Employee Retirement Income Security Act (ERISA), (2) violation of my constitutionally-guaranteed first amendment right of freedom of speech, (3) violation of the Sarbanes-Oxley Act (SOX), criminal and/or civil whistleblower provision(s), (4) civil RICO, (5) violation of my civil rights (specifically but not limited to the ADA, and (6) discrimination against me based upon my race, gender, age and disability (EEOC). Movant also seeks punitive and/or treble damages from the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson) as a remedy for their vicious actions against me.

I am financially ruined. My son and I are going to end up living on a grate in the nation's capital because I did my job and tried to prevent some of the madness we are now experiencing in the mortgage industry. My destruction is my reward. Fannie Mae and Bear Stearns helped to create the madness we are now experiencing in the mortgage industry. Their reward is a bailout and opportunities to make more money. The head of Countrywide allegedly called a homeowner disgusting because he wrote to Mr. Mizolo asking for help to prevent the loss of his home. According to "Ethics vs. Making a Living" (August 2000) Mahatma Ghandi "included in his SEVEN BLUNDERS OF THE WORLD THAT LEAD TO VIOLENCE one about Commerce Without Morality"…His words were "Commerce Without Morality: As in wealth without work we indulge in commerce without morality to make more money by any means possible. Price gouging, palming off inferior products, cheating and making false claims are a few of the obvious ways in which we indulge in commerce without morality. There are thousands of other ways in which we do immoral or uneithical business. When profit making becomes the most important aspect of business, morals and ethics usually go overboard. We cut benefits and even salaries of employees. If possible, we employ "slave" labor…"
It seems only fitting that I should have included a quote from Mahatma Ghandi here since India has acquired so many jobs that Americans have lost so that large corporations can make more money at any cost to others.

My sister served in the Navy. She became partially disabled. My brother was a Marine who was wounded twice and received medals for his service in the Vietnam war. He was also exposed to Agent Orange, and the cancer developed in his body for a long time. He died while I was working at Fannie Mae. Fannie Mae had a policy of sending floral

arrangements to employees who lost loved ones, and they notified coworkers of the employee's loss. When my brother died and I notified Karen Mychalus and Verna Robinson nothing was said, and nothing was sent to my family. When Karen's admin, Marie Malone, had a loss (her dog died) Karen sent an email to the entire group (including me) to tell us how heartbroken Marie was and that she would be out of the office for awhile. When Sherry Pickney's grandmother died Verna directed us not to bother Sherry with anything; in front of us in a team meeting with Sherry present Verna told us that Sherry was too upset about her grandmother to give her status on her projects and that Verna would speak for Sherry. I meant nothing to them. My brother's death as a result of his service to our country meant nothing to them. The only way that any coworkers found out about my brother was through my tears.

My house has been scheduled for a foreclosure auction soon. My son and I are going to be homeless. I have included exhibits (copies of original documents) which support this motion. However, I am sick, my chronic pain level is off the charts, I am stressed and depressed. I could not organize the exhibits in a fashion that would coordinate with the paragraphs herein. This is all too much for me. All I did was tell the truth about the improprieties that were occurring within Fannie Mae. I now understand why others only spoke about it in whispers or if they had the protection of a high-ranking manager within the organization. The price that my son and I have paid is too high.

Khadija Duma
1840 Massachusetts Ave., SE
Washington, DC 20003
(202) 546-6281

21

## CERTIFICATE OF SERVICE

I, Khadija Duma, certify that on this 29th 28th day of May, 2008 I mailed a first class a copy of

the foregoing to the following:

Counsel for the Fannie Mae Defendants (Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson):

Attn: Damien G. Stewart
Fannie Mae Legal Department
3900 Wisconsin Avenue, NW
Washington, DC 20016

Counsel for UNUM Provident:

Attn: Mary C. Zinsner
Troutman Sanders LLP
1660 International Drive (Ste. 600)
McLean, VA 22102


Khadija Duma
1840 Massachusetts Ave., SE
Washington, DC 20003
(202) 546-6281

PO Box 1023
Washington, DC 20013
(202) 546-6281

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA


KHADIJA DUMA,

   Plaintiff


   VS.                              CIVIL ACTION NO  1:08-cv-00581 JDB


UNUM Provident,
Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson,

   Defendants

---

**ORDER**


UPON CONSIDERATION OF PLAINTIFF'S LIKELY SUCCESS ON THE MERITS

PLAINTIFF'S  MOTION FOR A DEFAULT JUDGMENT IN THE AMOUNT OF

THIRTY MILLION DOLLARS IN FAVOR OF AND ON BEHALF OF MOVANT,

KHADIJA DUMA, AND AGAINST THE FANNIE MAE DEFENDANTS (FANNIE

MAE, DROR OPPENHEIMER, KAREN MYCHALUS, VERNA ROBINSON) IT IS

THIS _____ DAY OF MAY, 2008 ORDERED THAT MOVANT'S MOTION FOR A

DEFAULT JUDGMENT AGAINST FANNIE MAE, DROR OPPENHEIMER,

KAREN MYCHALUS AND VERNA ROBINSON IN THE AMOUNT OF THIRTY

MILLION DOLLARS IS GRANTED AND SO ORDERED.


                              _____
                              DISTRICT COURT JUDGE JOHN D. BATES

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**KHADIJA DUMA,**

    **Plaintiff**

    **VS.**           **CIVIL ACTION NO <u>1:08-cv-00581 JDB</u>**

**UNUM Provident,**
**Fannie Mae, Dror Oppenheimer, Karen Mychalus, Verna Robinson,**

    **Defendants**

---

## <u>SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST FANNIE MAE, DROR OPPENHEIMER, KAREN MYCHALUS, VERNA ROBINSON IDENTIFYING LIST OF ATTACHED EXHIBITS</u>

**EXHIBIT 1** – Fannie Mae printout from onsite computer of my status, job title and merit increases from time of hire (I was still working at Fannie Mae at the time that I printed this information). Clearly shows that according to official Fannie Mae records and Fannie Mae's payroll division my job title during my employment with Fannie Mae was that of Senior Business Manager; never Senior Business Analyst (which is contrary to what counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus and Verna Robinson has mislead this Court to believe). Dated: 5/14/2002

**EXHIBIT 2** – Fannie Mae printout from onsite computer of all internal training I successfully completed while I was working at Fannie Mae. I also attended testing automation classes that were offsite, and the internal Risk Management classes taught by Guy Depry (director of risk management) which explained

the intricacies of the general ledger and the subledger for for Fannie Mae's financial systems.  Dated: 5/14/2002

EXHIBIT 3 - Email confirmation from outside vendor of my involvement in the software test automation that I was advocating for Fannie Mae and was being vilified by Fannie Mae management for pushing for it; however, the Office of Federal Enterprise Housing Oversight (OFHEO) later sanctioned Fannie Mae for the lack of software testing automation.  Dated:5/24/2002

EXHIBIT 4 - Email from me to the secretary, Angela Strader, for Dror Oppenheimer. We were told that if we had questions for Dror to answer in the all hands meeting we should submit them before the meeting to Angela.  This all hands meeting was set up after several people had summarily been fired and escorted by security off the premises.  Dated: 5/29/2002

EXHIBIT 5 - Email confirmation from outside vendor of my involvement in the National Capital Area software testing forum which provided state-of-the-art information regarding software testing, automation, tools, contact information, best practices, etc.  Dated: 6/7/2002

EXHIBIT 6 - Email from me to Verna Robinson (cc: Karen Mychalus) to cover myself regarding a delayed arrival.  Everything I did resulted in a rebuke of some sort.  Dated: 8/19/2002

EXHIBIT 7 - Cover my bases protection-email from me to Verna Robinson (cc: Karen Mychalus).  Dated: 8/19/2002

EXHIBIT 8 - Update to email in EXHIBIT 6.  Dated: 8/19/2002

EXHIBIT 9 - Reply and acknowledgement from Dan H. Mudd of the forty-page email I had sent to Frank Raines and him detailing my plight.  Dated: 12/17/2002

EXHIBIT 10 (a,b,c) – Feedback from Jess Liu, a team member, on my performance as a team member on the AABW project representing testing.  Dated: 12/19/2002

EXHIBIT 11 (a & b) -Email from me to Verna Robinson (cc: Karen Mychalus) objecting to her constant harassing of me, lying about me, and discriminatory treatment towards me.  Dated: 2/23/2003

EXHIBIT 12 - Email from me to Verna Robinson (cc: Karen Mychalus) related to health and need for early departure.  I should not have had to discuss in detail my medical status; however, Verna and Karen were unrelenting in this matter. Dated: 2/27/2003

EXHIBIT 13 - Sick slip from my primary care physician (PCP); necessary due to constant harassment from Verna Robinson and Karen Mychalus.  Dated: 2/28/2003

EXHIBIT 14 -    Copy of fax transmittal sheet sent to the nurse in health services who was handling my medical leave requirements; further evidence of the extent to which I had to go to make certain that I could survive Verna Robinson and Karen Mychalus. Dated: 3/4/2003

EXHIBIT 15 -    Email request from me to Verna Robinson (cc: Karen Mychalus) for a softcopy of my performance review to make it easier for me to respond to the comments made in it. Dated: 3/7/2003

EXHIBIT 16 (a,b,c,d,e) -    Email from me to Verna Robinson (cc: Karen Mychalus) requesting information regarding Fannie Mae policy governing responding to a manager's (Aileen Morse) initial comments regarding my performance and then changing her performance review of me after she saw my comments regarding my experience on a rotation (temporary assignment) in her group. Performance comments in question are part of this exhibit. Dated: 3/7/2003 (includes comments and performance feedback with additional dates)

EXHIBIT 17 -    Email from me to Becky Detchon to check on her after she revealed to me an employee had filed a complaint against her with the Office of Corporate Justice. I went to Becky to check with her since Verna Robinson told me in a meeting with Lisa Kober that everyone that I worked with, including Becky, on the AABW project was dissatisfied with my performance and did not want to work with me again. Becky was angry with Verna's version and told me that she had told Verna that I did a satisfactory job on AABW. Dated: 4/3/2003

EXHIBIT 18 -    Cover letter for charging document against Fannie Mae from EEOC on my behalf. Mr. LaRocca had so many errors in the charging document that I could not sign it, and he never returned my telephone calls to discuss it. I later learned that he had left this field office, but no one had contacted me to let me know although I had called and spoken to supervisors often. I did not find out that he had left this office until I was able to physically go to the office again. I was promised that since the error was made by Mr. LaRocca and the EEOC that I would not be time barred from continuing with my complaint against Fannie Mae; however, Mr. Silvio Fernandez, deputy director, later reneged on that commitment to me. Fannie Mae knew about this circumstance because I openly discussed it with Lisa Kober, Verna Robinson, Karen Mychalus and the Office of Corporate Justice.

EXHIBIT 19 -    Email communications between Anne Catanzarite (contractor nurse who was assigned to handle my medical leave) and me (cc: Verna Robinson, Lisa Kober) Dated: 4/7/2003

EXHIBIT 20 -    Notification to me from Dyck O'Neal , Inc. that Fannie Mae had advised them that I had been terminated. Dated: 8/23/2003

EXHIBIT 21 (a & b) -  Email from me to Anne Catanzarite (cc: Verna Robinson, Karen Mychalus, Lisa Kober) that included medical information that violated my privacy, but the harassment from Verna Robinson and Karen Mychalus sanctioned by Lisa Kober allowed them to get away with demanding this type of information which lends credence to their involvement in UNUM Provident's decision regarding my wellness. Dated: 3/28/2003

EXHIBIT 22 -  Short Term Disability and Extended Leave Authorization sent to me by the supervising nurse for Fannie Mae's health services (note: my employee title is Senior Business Manager, contrary to what counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus and Verna Robinson has deliberately mislead this Court to believe). This Fannie Mae document also documents that I did not go out on short term disability until May 23 not on May 21 as counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus, and Verna Robinson has deliberately mislead this Court to believe. This Fannie Mae document also shows that I returned to work on 6/2/2003; but, I was told to go home by Lisa Kober and health services because I was not well. Dated: 8/27/2003

EXHIBIT 23 (a & b) -  Memo from me to Fannie Mae's health services documenting the deliberate mishandling of my short term disability benefits in the health services department (by copying Timothy Hyde, head of payroll, I was able to get paid). Dated: 9/9/2003

EXHIBIT 24 -  Memo from me regarding coercion from Fannie Mae to have an undesirable, invasive spinal column surgery. Dated: 9/22/2003

EXHIBIT 25 -  Short Term Disability and Extended Leave Authorization sent to me by the supervising nurse for Fannie Mae's health services (note: my employee title is Senior Business Manager, contrary to what counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus and Verna Robinson has deliberately mislead this Court to believe). This Fannie Mae document also documents that I did not go out on short term disability until May 23 not on May 21 as counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus, and Verna Robinson has deliberately mislead this Court to believe. This Fannie Mae document also shows that I returned to work on 6/2/2003; but, I was told to go home by Lisa Kober and health services because I was not well. Dated: 9/25/2003

EXHIBIT 26 (a & b) -  Memo from me to health services and Fannie Mae's legal department regarding the harassment I endured while on medical leave. Dated: 10/13/2003

EXHIBIT 27 -  Short Term Disability and Extended Leave Authorization sent to me by the supervising nurse for Fannie Mae's health services (note: my employee title is Senior Business Manager, contrary to what counsel for Fannie Mae, Dror Oppenheimer, Karen Mychalus and Verna Robinson has deliberately mislead this Court to believe). This Fannie Mae document also documents that I did not go out on short term disability until May 23 not on May 21 as counsel for

*EXHIBIT-1*

Previous Next Search

# Contribution by Employee

| Name | Date | Type | Percent | Amount | Salary | Position |
|------|------|------|---------|--------|--------|----------|
| Duma,Khadija | 02/24/2002 | Mer | 0.02 | 1786 | 91106 | Sr Business Manager |
| Duma,Khadija | 02/25/2001 | Mer | 0.015 | 1320 | 89320 | Sr Business Manager |
| Duma,Khadija | 06/26/2000 | Hir | 0 | 0 | 88000 | Sr Business Manager |

# Training History by Employee

| Name | Course | Start | End | Status | Source | EDR Type |
|------|--------|-------|-----|--------|--------|----------|
| Duma,Khadija | Accounting Basics | | 03/19/2001 | Finished | In-House | |
| Duma,Khadija | Business Processing in Asset Servicing O | | 01/31/2002 | Finished | In-House | |
| Duma,Khadija | Coaching for Performance & Development | | 08/29/2000 | Finished | In-House | |
| Duma,Khadija | Cornerstones of Constructive Communicati | | 08/08/2001 | Finished | In-House | |
| Duma,Khadija | e-Business for Fannie Mae Employees | | 12/08/2000 | Finished | In-House | |
| Duma,Khadija | EAH Seminar | | 11/13/2000 | Finished | In-House | |
| Duma,Khadija | Fair Employment R&R - Employees | | 10/19/2000 | Finished | In-House | |
| Duma,Khadija | Introduction to XML | | 06/19/2001 | Finished | In-House | |
| Duma,Khadija | Investor Accounting II | | 05/21/2001 | Finished | In-House | |
| Duma,Khadija | LASER Database Structure and Records | | 03/09/2001 | Finished | In-House | |
| Duma,Khadija | Making The Dream A Reality | | 08/01/2000 | Finished | In-House | |
| Duma,Khadija | Negotiating Skills | | 03/27/2001 | Finished | In-House | |
| Duma,Khadija | New Employee Immersion | | 08/01/2000 | Finished | In-House | |
| Duma,Khadija | New Employee Informational Session | | 10/19/2000 | Finished | In-House | |
| Duma,Khadija | Newly-Hired Manager/Director Immersion | | 12/07/2000 | No Show | In-House | |
| Duma,Khadija | Problem/Change Management Plus! | | 01/18/2001 | Finished | In-House | |
| Duma,Khadija | Process Improvement in ADM | | 08/30/2001 | Finished | In-House | |
| Duma,Khadija | Project Management Workshop | | 12/21/2000 | Finished | In-House | |
| Duma,Khadija | Software System Testing | | 09/07/2000 | Finished | In-House | |
| Duma,Khadija | Testable Requirements | | 10/20/2000 | Finished | In-House | |
| Duma,Khadija | Working in a Diverse Company | | 08/07/2000 | Finished | In-House | |
| Duma,Khadija | XML for Object Oriented Programmers | | 07/18/2001 | Finished | In-House | |

**Subject: Re: Software Test Automation Fall 2002 Brochure Request**
Date: Fri, 24 May 2002 08:56:26 -0400
From: jjones@sqe.com
To: "Khadija Duma" <khadija_duma@fanniemae.com>

Dear Ms. Duma,

Thank you for your interest in Software Quality Engineering's Test Automation Fall conference.  We will not have brochures available until early June . We will keep your information on file and send out the brochure when we receive them. Of course, we will send out any additional brochures that you have requested.  We appreciate the opportunity to service your needs. Please contact us via email or at 904-278-0707 if we can be of any further assistance.


Best Regards,
John Jones
Customer Service



"Khadija Duma" <khadija_duma@fanniemae.com> on 05/24/2002 08:50:44 AM

Please respond to "Khadija Duma" <khadija_duma@fanniemae.com>

To:    sqeinfo
cc:
Subject:  Software Test Automation Fall 2002 Brochure Request



This Email originated from server named:      www.sqe.com
This Message was sent on:                      Friday 5/24/02 8:50:44 AM
The sender was connected to the internet via:  198.204.141.71
Using this browser:                            Mozilla/4.51 [en]C-CCK-MCD
(WinNT; U)
Mailer Version: 2.0 Reads for secure
Subject:  Software Test Automation Fall 2002 Brochure Request
-------------------- General Information -------------------
Salutation:           Ms.
Name:                 Khadija Duma
Organization:         Fannie Mae
Title:                Senior Business Manager
Address:              PO Box 1023

City:                 Washington
State:                DC - District of Columbia
Country:              US - United States
Zip Code:             20013
Telephone:            703 833-5137
FAX:                  703 833-5555
E-Mail:               khadija_duma@fanniemae.com
------------------- Requested Brochures ------------
Brochure1:
Brochure2:
Brochure3:
Brochure4:             Requirements
Brochure5:             Software Testing
Brochure6:             Software Development
Brochure7:             Software Management
Brochure8:             Software Measurment
Brochure9:             Web/eBusiness Testing
----------------- Demographic Information -----------
Topical Interest:      General Software Development/Engineering,
Measurement, Objects & Components, Project Management, Quality Assurance,

**Subject: Re: ADM All Hands Meeting**
**Date: Wed, 29 May 2002 13:20:50 -0400**
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>    **Internal**
**Organization:** Fannie Mae
**To:** Angela Strader <angela_strader@fanniemae.com>

**Here are my questions...**

**Some of us are waiting for the other shoe to drop.** An abrupt dismissal due to a reorg would be devastating to my single income household.

1.) Will the additional changes that are coming put some of us out of work? Should we begin looking for jobs internally, if possible, and externally?

2.) Will the additional changes that are coming force some of us to take significant pay cuts in order to remain employed?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Angela Strader wrote:

> Please join Dror and Bob tomorrow at 3pm in room 5120 (501) for a question and answer session on the
> recent changes in our organization.
>
> All questions are welcome during the meeting. Or you can leave your questions in the box outside of my
> desk. The box will be taken at noon tomorrow so that the questions submitted can be discussed during the
> meeting.
>
> Thanks.
>
> Angela

**Subject: Software Testing Forum for the National Capital Area**
**Date:** Fri, 07 Jun 2002 08:36:57 -0400
**From:** "ALP International" <stf@alpi.com>
**To:** khadija_duma@fanniemae.com

Dear Khadija Duma,

Thank you for registering for our upcoming National Capital Area Software Testing Forum.  The purpose of this email is to let you confirm your attendance, and also to notify you of any changes in location or the agenda. To Confirm your attendance, please click the following link:

http://www.alpi.com/index.cfm?section=Events&fuseaction=Confirm&ContactID=1969&Email

Our next meeting is scheduled to take place on Thursday, June 13, 2002, from 1:00 PM to 4:00 PM.

Our agenda will be as follows:

TECHNOLOGY FOR THE TESTER

```
12:45 - 1:00 - Registration
1:00 - 1:15 - Introduction & The State of Testing
              Sarah Roderus - ALP International
1:15 - 2:00 - Finding the Root Cause of Your Errors
              Fred Voccola, Identify Software
              Frank Tisellano, Identify Software
2:00 - 2:45 - The Importance of Requirements in Testing
              Scott Jefferies, StarBase Corp.
2:45 - 3:25 - Break-out Sessions
3:25 - 4:45 - Certifications for Software Testers
              Andrew Pollner, ALP International
3:45 - 4:00 - Open Discussion
```

For directions, please visit: http://www.alpi.com/index.cfm?section=Events

Sarah A. Roderus
Training & Events Manager
ALP International
(301) 654-9200 x403
www.alpi.com
sroderus@alpi.com

*******************************************
*  A L P   I N T E R N A T I O N A L  *
*******************************************
This message has been sent to you by ALP International.  The Software Testing Forum for the National Capital Area is an ALP International event.  Information about our next meeting is posted on our web site, and we invite you to register for this free event.  If you have any questions regarding the National Capital Area Software Testing Forum, please check our web site (www.alpi.com) under events for the latest information on the next event, or send us an e-mail with your registration information to stf@alpi.com.  We may also be reached at (301) 654-9200 x403, fax (301) 654-9203.

**Subject: delayed arrival for 8/20/02**
**Date:** Mon, 19 Aug 2002 19:03:07 -0400
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>     **Internal**
**Organization:** Fannie Mae
**To:** Verna F Robinson <verna_f_robinson@fanniemae.com>,
Karen F Mychalus <karen_f_mychalus@fanniemae.com>

, did not have a chance to eat lunch today. At 12:30pm while sitting at my terminal trying to work out a solution to the mess MS Project has made of my plan I ate the corn flakes that I brought for breakfast this morning. I barely got up from my chair today to go to the ladies room. Outside of going to the 11am AABW daily status meeting and discussing the project at my desk, I have not had time to do anything else. I had not had an opportunity to discuss a delayed arrival since all of my conversations with you were regarding AABW. For the second time I scheduled my Healthy Living Day off and for the second time I did not get a chance to take it. The first time I came in because of all the problems we were having with the functional requirements. This past Friday I planned to take it off, but I worked from 7am (beginning with Sabrina's arrival to work) until 4:30pm on AABW. I did not take care of any of the personal business that I had planned to address and, I did not get the rest that I needed. With all of that in mind and the fact that I didn't leave 3900 until 11pm yesterday I had planned to delay my arrival so that I could take care of personal business tomorrow. With both you and Karen deciding to reprimand me in front of Dror there did not seem to be any point to explaining my circumstances.

Also, for the record, if I am going to be penalized for the failure of software tools that I am using I would like to know in advance what the criteria and reprecussions are from such events. The fact that MS Project is working on other PCs does not obviate the fact that it is not working on mine.

**Subject: Per our conversation...**
**Date:** Mon, 19 Aug 2002 19:06:22 -0400
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>     **Internal**
**Organization:** Fannie Mae
    **To:** Verna F Robinson <verna_f_robinson@fanniemae.com>
    **CC:** Karen F Mychalus <karen_f_mychalus@fanniemae.com>

So that this does not come back to haunt me later...

Per our conversation in Dror's office. I was in a hurry this morning and left my pager on my bed. I was already too far from home to turn back when I realized that I had left it at home. Although I had planned to work in the test lab today to avoid distractions. I worked at my desk so that anyone who needed me could easily find me either by calling me or walking by.

**Subject: Re: delayed arrival for 8/20/02**
**Date: Mon, 19 Aug 2002 19:51:24 -0400**
**From: "Khadija Duma" <khadija_duma@fanniemae.com>     Internal**
**Organization: Fannie Mae**
**To: Verna F Robinson <verna_f_robinson@fanniemae.com>**
**CC: Karen F Mychalus <karen_f_mychalus@fanniemae.com>**

I added a few of words to the message below ...

**Khadija Duma wrote:**

I did not have a chance to eat lunch today. At 12:30pm while sitting at my terminal trying to work out a solution to the mess MS Project has made of my plan I ate the corn flakes that I brought for breakfast this morning. I barely got up from my chair today to go to the ladies room. Outside of going to the 11am AABW daily status meeting and discussing the project at my desk. I have not had time to do anything else. I had not had an opportunity to discuss a delayed arrival since all of my conversations with you were regarding AABW. For the second time I scheduled my Healthy Living Day off and for the second time I did not get a chance to take it. The first time I came in because of all the problems we were having with the functional requirements. This past Friday I planned to take it off, but I worked from 7am (beginning with Sabrina's arrival to work) until 4:20pm on AABW. I did not take care of any of the personal business that I had planned to address; and I did not get the rest that I needed. With all of that in mind and the fact that I didn't leave 3900 until 11pm yesterday I had planned to delay my arrival so that I could take care of personal business tomorrow. With both you and Karen deciding to reprimand me in front of Dror there did not seem to be any point to explaining my circumstances.

Also, for the record, if I am going to be penalized for the failure of Fannie Mae-supplied software tools that I am using in order to perform my job I would like to know in advance what the criteria and reprecussions are from such events. The fact that MS Project is working on other PCs does not obviate the fact that it is not working on mine.

EXHIBIT-9

**Subject:** reply
**Date:** Tue, 17 Dec 2002 10:58:46 -0500
**From:** "Daniel H Mudd" <daniel_h_mudd@fanniemae.com>     Internal
**Organization:** Fannie Mae
**To:** Khadija Duma <khadija_duma@fanniemae.com>
**CC:** Donald M Remy <donald_m_remy@fanniemae.com>

Khadija, thank you for bringing your concerns to my attention. Although you were not satisfied with your last interaction with the Office of Corporate Justice, I do believe the issues you raise are best handled by them. I have forwarded your email to Donald Remy, SVP Legal, and someone from his office will be in contact with you. Donald will ensure your issues are given fair and impartial review. Dan

**Subject:** Re: 2002 Feedback Request
**Date:** Thu, 19 Dec 2002 17:21:07 -0500
**From:** "Jess Liu" <jess_liu@fanniemae.com>    Internal
**Organization:** Fannie Mae
**To:** Khadija Duma <khadija_duma@fanniemae.com>,
Verna F Robinson <verna_f_robinson@fanniemae.com>

Verna,

Attached is my feedback on Khadija's performace.

Thanks,
Jess

Khadija Duma wrote:

All,

AABW has dominated our lives so I apologize for the late notice. If you are able to take a few minutes out of your busy schedules to provide feedback using the attached Performance Feedback Worksheet to Verna on my performance during my working relationship with you for my performance review, I would appreciate it. If you feel comfortable copying me on any feedback you provide to Verna, it would be helpful to me. However, if you will provide the feedback, but would rather not copy me on it that's okay. Verna's last day for the year is 12/20/02 (she will be on vacation after that). If you could complete this by 3pm 12/20/02 and return it, it would be a big help. I should be measured against the following criteria:

Quality factors:

1. Critical Thinking
2. Customer Focus
3. Accelerating Change
4. Intellectual Honesty and Integrity
5. Teamwork and Valuing Others
6. Interpersonal and Influencing Skills
7. Delivering Results

This year has been memorable in many ways. Going beyond simply saying that there were lessons learned, I have lived long enough to appreciate differences and similarities in favorable light (this has become a benefit to me because there is always something to be gleaned from every situation that can be constructive when viewed in a favorable light). I have enjoyed working with all of you, and I wish you safe and happy holidays.

Thanks,

Khadija

| | |
|---|---|
| 📄 Khadija's Performance Feedback Worksheet 2002.doc | **Name:** Khadija's Performance Feedback Worksheet 2002.doc<br>**Type:** Winword File (application/msword)<br>**Encoding:** base64 |

# Performance Feedback Worksheet

Employee Name: __Khadija Duma_____ Manager Name: Kathy Mull/Verna Robinson____

Feedback Provider: __Jess Liu_____

Relationship: **X** Peer          ❏ Internal customer     ❏ Direct report

Degree of Exposure:     ❏ Significant   **X** Moderate   ❏ Limited

Feedback can be shared with individual being reviewed: **X** Yes   ❏ No

You have been selected to provide feedback on this individual's performance as part of the 2002 performance management process. Please complete this form and return to me via E-mail or hard copy no later than _____. If this person worked on more than one project/assignment, you may wish to use multiple worksheets.

| |
|---|
| **Situation**<br>1. What was the nature of your work with this individual (e.g. supervisory relationship, project or assignment)?<br>2. What were the goals and/or objectives of the project(s)/assignment(s)?<br><br>Actual/ Actual Biweekly product implementation |
| **Responsibilities**<br>1. What role did this individual play?<br>2. What were this individual's responsibilities related to the projects(s)/assignment(s)?<br><br>Product test management |

**Actions**

1. List the <u>Success Qualities</u> and/or job specific competencies utilized by this person in his/her role and describe how they were demonstrated on the project/assignment.
2. What could this individual have done differently to be more effective? Discuss how you believe the alternative action would have impacted the outcome of the project/assignment.

She demonstrated the following qualities on the project:

Critical Thinking:

- o  Identifying and considering alternatives
- o  Keeping broader organizational goals in mind when making decisions about own work
- o  Considering effects of actions and decisions on other groups in the organization

Intellectual Honesty and Integrity:

- o  Being honest and forthright with people
- o  Being fair and equitable with people
- o  Making honest and objective presentations of business information
- o  Voicing one's concerns even when they may be unpopular

Teamwork and Valuing Others:

- o  Treating others with respect
- o  Coordinating own projects with others
- o  Working toward solutions that others can support
- o  Understanding and supporting the needs of the organization

Interpersonal and Influencing Skills:

- o  Identifying and addressing others' most important issues and needs
- o  Addressing conflict with others directly and constructively
- o  Demonstrating openness to feedback

Delivering Results:

- o  Taking initiative
- o  Demonstrating a sense of urgency about work completion
- o  Making decisions or facilitating timely decision making
- o  Maintaining focus on goals
- o  Ensuring accuracy, completeness, and quality of work

**Results**

1. Discuss this individual's overall contribution to the project/assignment?

She's provided an excellent key role in controlling the on-going product testing. Even there were many factors to cause the whole project being late, I should still admire her courage in charge of overall schedule movement.

**Additional Comments** (optional):

**Subject: Re: Due date for two assignments**
**Date:** Wed, 26 Feb 2003 13:10:23 -0500
**From:** Khadija Duma <khadija_duma@fanniemae.com>
**Organization:** Fannie Mae
**To:** Verna F Robinson <verna_f_robinson@fanniemae.com>
**CC:** Karen F Mychalus <karen_f_mychalus@fanniemae.com>

**Verna,**

**At this time I will renew my objections to many of your observations.**

Clearly, many of the additions that you suggest, which are not already included in the document, are outside of the scope of the training for the general population of analysts. You claim that the entire document is a cut and paste. That allegation is not true. Not only that, but I was upfront about the source of the information and why I chose to take it directly from the functional requirements. You told me to put together a training package. You did not tell me that I was required to write it from scratch. I am not afraid to write. On the contrary, I write quite well. You claimed that information regarding the following did not appear in the document, but it does (and when I showed it to you, you claimed it was a direct quote from the functional requirements; but, I wrote it and you could not tell the difference (in fact, it appeared that before I pointed it out to you that you had not read it):

1. Relationship of the loan asset on the Shaw system and it's subsequent flow to LASER  This exists in the document now.

2. Update of LASER via the Overlay file of transactional information and the timing of that update. This exists in the document now.

3. Who corrects and when. This exists in the document now.

4. What is the impact of the Overlay update of LASER as it relates to the General Ledger, the Subledger, and LASER report. You told me today that the business analysts would know most of the information regarding LASER processing and mortgage basics. If that is the case, the information I included in the document is sufficient since this process has not changed except for the addition of the second Overlay file which I account for.

5. What operational limitations were discovered during testing, and how or will these impact the business analyst. I do not understand what you are looking for here as it would relate to an analyst outside of Ops (Becky's group).

6. Provide a general understanding of how the product will update on the Shaw system i.e. daily vs. monthly  I do not understand what you are looking for here as it would relate to an analyst outside of Ops (Becky's group).

7. MAST—how is MAST impacted from this process? The timing. MAST did not change its process for this product. It will continue to use the first Overlay to produce its trading factors. If the second Overlay is good and is passed on to MAST, MAST will use it to update its information. If you want me to include this information in the package, I will do so.

8. Accounting on LASER, accounting on Shaw, the relationship. LASER is only a conduit for the calculations that are passed to it from the SHAW application. What are you looking for here?

9. Does LASER produce any data on these loans and who receives it. This exists in the document now.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1. What data populates to the Overlay file and why. There are over 60 fields that are populated on the Overlay file (some are derived and some are not) and only the Ops group will be involved in working with the lenders to determine what should populate those fields. Even within the Ops group not everyone works with the Overlay file

or understands it.

2. What LASER pre-edits apply to the data and what is the impact of failing an edit. There are over 80 pre-edits that execute during the LASER pre-edit process for AABW and DSI. A business analyst outside of the Ops group would not have a need to know what these pre-edits are or what they are used for (this is COBOL code).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I told you during our meeting this morning that I met with John Semples and Carolyn separately Monday since Carolyn was late. I told you that John said he liked the ideas of incorporating the "Understanding Mortgages" and "Glossary" into the document. You did everything but call me a liar. You told me that you did not like them. You told me that you had worked with John many times before and that you basically did not see him liking those things. Is there no end to the total disrespect? Why on earth would I tell you that he said he liked those aspects of the package, if he did not say that he liked them? I reminded you that I met with him at your behest.

Khadija
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Verna F Robinson wrote:

Khadija,

In response to our meeting today I am asking that you deliver:

(1) Modified AABW training document is due by 3:30 PM on 2/28/03. Please use the attached document as your guide for changes needed to make this document meet the business needs.

(2) First Draft of Test Plan for FRC convertibles is due by 3:30 PM on Monday 3/3/03.

**Subject: Early departure 2/27/03**
**Date:** Thu, 27 Feb 2003 12:03:45 -0500
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>    **Internal**
**Organization:** Fannie Mae
**To:** Karen F Mychalus <karen_f_mychalus@fanniemae.com>,
Verna F Robinson <verna_f_robinson@fanniemae.com>
**CC:** Anne Catanzarite <anne_catanzarite@fanniemae.com>

Karen/Verna,

This morning before I arrived I paged both of you to tell you that yesterday afternoon I had diagnostic testing performed to determine whether I had nerve damage. I also indicated that the diagnostic testing involved the deep penetration of needles into my muscles which has left me with residual pain. I had difficulty driving in today. I also stated in my page that I would call my doctor's office. My doctor will see me this afternoon. I need to leave here at 1pm in order to get there.

I am in the test lab, and you may either page me or reach me on extension 2263 if you need to talk to me before I leave for my doctor's appointment. I would have notified you sooner, but I had a 9am conference call and a 10am meeting (which ran until approximately fifteen minutes ago) with Carolyn and John regarding the AABW training materials.

Thank you,

Khadija

**WASHINGTON PRIMARY CARE PHYSICIANS**
660 Pennsylvania Ave., S.E. Suite 100  Washington, DC 20003
(202) 546-4504  Fax: (202) 544-6136

**SICK SLIP**

02/28/2003

RE:  KHADIJA DUMA

To Whom it May Concern:

This is to certify that the above patient was under my professional care on 02/28/2003.

She has shoulder and arm pain. Probable exacerbation of her carpal tunnel syndrome.
Therapy: pain medication, gentle ROM exercises, heat.

Restrictions: no driving, avoid repetitive strain. These remain in effect until she is to be seen by orthopedics 3/6/2003

Sincerely,

Sos A Mboijana MD

```
HP LaserJet 3100
Printer/Fax/Copier/Scanner
```

```
SEND CONFIRMATION REPORT for
Mail Boxes Etc.
202 543 1603
Mar-4-03  12:56
```

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|-----|-----------|-------|--------------------|------|-------|------|--------|
| 197 | 3/ 4 12:55.... | 0'43" | 202 752 2768 | Send............. | 2/ 2 | EC144 | Completed....................................... |

Total    0'43"    Pages Sent: 2    Pages Printed: 0

# Fax
## Transmittal Sheet

 **MAIL BOXES ETC.**

Making Business Easier™ Worldwide

**Our Mail Boxes Etc. Center is Ready to Assist You in the Following Areas:**

- Mail Receiving
- Mail Forwarding
- 24-hr Mailbox Service with Street Address
- Call in MailCheck™ Service
- UPS® Authorized Shipping Outlet
- Ground, Three Day, 2nd Day Air and Next Day Air
- Federal Express® Authorized Shipping Center
- Express Save, Second Day, Standard and Priority
- Other Carriers
- Custom Packaging
- High Value Artwork, Electronics and Computer Specialist
- Custom Boxes and Crates
- Packing, Shipping and Moving Supplies
- Copies
- Stamps and Metered Mail
- Office Supplies
- Notary
- Business Cards and Stationary
- Rubber Stamps
- Engraved Items
- Passport Photos
- Etc., Etc., Etc.

Visit Our Web Site et:
www.mbe.com/usa/mbe2092.htm

Transmitted Via:

Mail Boxes Etc. -- Capitol Hill,
Washington, DC

If there are any problems with this
transmission, please call:
(202) 543- 0850

☒ Urgent
☒ Confidential

**Four Convenient Locations:**

Capitol Hill
(202) 543-0850

Georgetown
(202) 342-0707

Farragut North
(202) 785-3604

- Georgetown University
(202) 687-7438

Date: 3/4/03   Time: 12:40 pm
To: Anne / Health Services
Fax No: (202) 752 - 2768
From: Khadija Dunn
Phone No: 1-800-SKY-FNMA
# of Pages (including this sheet): 2
Message: When I called in this morning
and spoke to Vegan she said that based
upon the email from Health Services she
had expected me to be out until Thursday.



**Subject: Request softcopy of review**
**Date:** Fri, 07 Mar 2003 14:24:10 -0500
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>      **Internal**
**Organization:** Fannie Mae
**To:** Verna F Robinson <verna_f_robinson@fanniemae.com>
**CC:** Karen F Mychalus <karen_f_mychalus@fanniemae.com>

Verna,

Per my request to you, please provide me with a softcopy of the review
you just handed to me.  I need it for a meeting Monday morning, and I
would like to have it write my response over the weekend.

Thanks,

Khadija

**Subject: Request info**
**Date:** Fri, 07 Mar 2003 14:27:11 -0500
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>    **Internal**
**Organization:** Fannie Mae
**To:** Verna F Robinson <verna_f_robinson@fanniemae.com>
**CC:** Karen F Mychalus <karen_f_mychalus@fanniemae.com>

Is there a corporate policy regarding how I should respond to your
comments in my review that are attributed to Aileen?

Throughout the annals of history I am certain that this scenario has oft been repeated — a lone voice seeking equity amidst a torrent of lies and misrepresentations designed for one purpose — to get rid of me.

Rebuttal to Aileen Morse's attempt to rewrite history:

Aileen was sent a copy of my rebuttal along with her original remarks (please see below). I also sent a copy of these original remarks and rebuttal to Karen and Verna before my year-end performance review was done, at Verna's request (she asked for information regarding my rotation). Therefore, it is completely unclear to me how Verna is able to make the assertion that she knew nothing of these matters (issues) before my review was done.

1.   - Original rotation remarks (attached to this email as a separate document):
2.   - My rebuttal to Aileen's original rotation remarks (see below):

Rotation:

To begin with, perhaps Aileen would benefit from having her recollection refreshed. When I began the rotation it was at Aileen's direction that I approached two team members who had been matrixed to her with her agenda. Both of them disagreed with the scope of their duties, per her explanation to me. In the resulting meeting between the four of us Aileen redressed her initial assertions and modified her expectations. Somehow the residual fallout from that disagreement became associated with me. Aileen suggested that I apologize to them for something that I did not do. I followed her initial instructions and then got blamed. I do not believe that I am the blind soldier following orders and that I have no responsibility in any of this. However, I do believe that there is enough liability that it should be prioritized and shared. I take responsibility for my failures. I expect others to do the same.

Additionally, as regards my rotation in Aileen's group, I successfully created, promoted, and conducted a Developers' Forum that required me to have constant contact with between sixty and seventy people for several months. I did not have any problems dealing with either FannieMae FTEs or external vendors. Aileen never received any complaints about me during this entire time. Regarding my Developers' Forum (Mainframes + Client Servers = Mismatch or The Perfect Blend?) Aileen said, " it was well received and i think you did a very good job of it." Certainly my use of interpersonal skills had a lot to do with the success of that project. The Enterprise Architecture/Technology Architecture group has never had a Developers' Forum as well attended and received as mine was (this is an admission they have made).

When I interviewed with Aileen for the rotation she and I had a lengthy, detailed conversation. I told her of my frustration with the crippling affect of telling the truth and then being penalized for it. I told her that I wanted to be valued for my professionalism and candor. I wanted to be able to speak the truth without being blackballed for it. Aileen told me that everybody on her team spoke their minds, had strong personalities and many had been viewed by others where they previously worked as difficult. She even joked about this in one of the first team meetings I attended. She told me that I would not have any problems speaking my mind in her group. Well, that turned out not to be true, as I have told her. It seems that as a guest, and I stepped back to accommodate this reality, my candor was not received well. There is a distinct difference between speaking your mind and going along to get along. There were team members who were known for their acid tongues — it was common knowledge and openly discussed amongst the team members. However, those character traits were accepted. Since my expertise was not appreciated, except when others needed information from me, I began to carefully diminish the reality bites I provided to others. In a team meeting about the technology solution templates, specifically the operations tracking template, Aileen verbally shot down everything that I said and agreed with everything that was contrary to my position. She sat diagonally across from me with arms folded, for the most part, across her chest. Both the nonverbal and verbal communication to me was clear. Although, I was later told by team members, the path decided for the operations tracking was not a smooth one after those decisions were made. The fiasco related to the workplace collaboration template similarly relegated me to a backseat in this dubious process. It is difficult to be excited about an assignment when your input is devalued and disregarded. I do not mind when people disagree with me. I mind when I am expected to jump through hoops merely, as it seemed, to delight others. It was impossible to know what the rules of the game were since they were constantly in flux, and often seemed arbitrary and capricious. Please see email message below:

**The following email feedback is provided to rebut the assertion that I did not understand or participate as a Level 5 on the technology solution templates that were assigned to me by Aileen Morse:**

Subject: [Fwd: [Fwd: Peer review request]]
   Date: Mon, 07 Jan 2002 17:30:38 -0500
   From: "Donna_joy" <donna_joy@fanniemae.com>       Internal
Organization: Fannie Mae
   To:   Aileen Morse <aileen_morse@fanniemae.com>
   CC:   Khadija Duma <khadija_duma@fanniemae.com>

Aileen, sorry -- I should have included you on this last message. However, I didn't see your message until I had already sent this.
------- Original Message -------
   Subject: [Fwd: Peer review request]
   Date:   Mon, 07 Jan 2002 17:25:21 -0500
   From:   Donna F Joy <donna_f_joy@fanniemae.com>
Organization: Fannie Mae
   To:    Kathy E Mull <kathy_e_mull@fanniemae.com>,Khadija Duma <khadija_duma@fanniemae.com>

I looked at the attached form a while ago, but didn't complete it then because it seemed to ask for more detail than I have to give.

I worked with Khadija for a part of one project. I enjoyed working with Khadija. During that project she had a new area to develop, and "lots of cooks in the kitchen". I saw that she redid things multiple times to satisfy the group reviews that were done for each deliverable. Her medical situation caused her to be out for the completion of the task. However, the team was able to pick up her work and complete

the task on schedule.

------- Original Message -------
**Subject: Peer review request**
**Date:  Wed, 19 Dec 2001 16:27:28 -0500**
**From:  "Khadija Duma" <khadija_duma@fanniemae.com>**
Organization: Fannie Mae
**To:    Donna Joy <donna_joy@fanniemae.com>**

Donna,

**Please take a minute to complete the attached peer review form for me then forward it to Kathy Mull.  Also, if you are comfortable doing so, please forward a copy of the completed form to me.**

**Thanks in advance for your assistance in this matter.**

**Khadija**

It was at Aileen's direction (due in large part to the time I lost as the direct result of my injuries) that I drop the other tasks to focus on the forum and white paper.  Aileen said that my vacation and my illness affected my tasks.  The vacation was scheduled long before the rotation took place, and I informed her that I had that vacation on my schedule before I started the rotation.  Furthermore, the vacation was scheduled, as I told her, to accommodate the closing on my first home purchase, which was subsequently postponed three times, and required me to add one vacation day to the time I had already scheduled.

Aileen states that I am excited about those things that I like to do.  Human nature aside, it is likely that any reasonable person would be excited about those things that they like to do.

Aileen's reference to Goal 3:

**Goal 3. participate in communications efforts to help get others involved in enterprise architecture and to help understand the vision. (This was never communicated to me as a goal.)**

In our conversations regarding the workplace collaboration and the definition of c-commerce Aileen told me that I had  vision and that I see the big picture while others on the team do not.  I had conducted a tremendous amount of research on the subject.  She said that I should teach the others to understand my vision and bring them along so that they can see what I see.  My preference was to acquiesce to the definition that she and others had because I did not believe, as I told her, that the time and energy we were spending to debate the issue (a singular definition) was effective use of the little time I had to accomplish so much.  What she failed to understand and what many fail to understand with me is that although I listen to opposing points of view I am not necessarily swayed by those views.  Many people seem to believe that I have not heard them or fairly listened to them, if after they have had their say I still do not agree with them.  Does it then become a failure on my part because I adopt the path they have not chosen?

I do not view my rotation with Aileen's group as a failure.  The group was not performing the types of tasks I expected, and the direction of the group was evolving which left some things up for grabs and could at times be disconcerting.  I learned some things I did not know.  I provided information and expertise they did not have.  I take away from it both the positive and the negative in a light that is most favorable to my future development as a professional and as a person.  I wish them well.

Aileen's comments regarding 1/2/02 – 2/28/02 are her blatant attempt to retaliate against me for the comments in my rebuttal.  Aileen never had a conversation with me in which she told me, as she alleges, " I also had to inform Khadija that she couldn't just "not" show up but had to work with health services, which she started to do."  It did not happen.  In her initial review she indicates that my vacation and illness impacted the time I had to work on one task.  Now she tries to allege  that I committed unprofessional offenses and that my behavior was serious enough to warrant a fictitious reprimand.  If that was true, why didn't she mention it during the timeframe that it supposedly happened?  Her attempt to make this fit into the January – February timeframe is a feeble attempt to cloak her vindictive actions.

The reference she makes to a meeting is the reference I make to a meeting in my rebuttal.  None of this happened, as she alleges, during January and February of 2002.  For almost the entirety of January I worked on my Developers' Forum nonstop.  It was presented on 1/29/02.  After the Developers' Forum I spend the remainder of my time evaluating the results of the forum and evaluating which research that I had performed for the forum would be most useful for the white paper.  She is angry because of the rebuttal – plain and simple.

 I developed the white paper before I interviewed with Aileen for the rotation, and she knows it.  The rotation was supposed to be an opportunity for me to write a paper that I had already developed under the auspices of a group that was supposed to be "forward thinking".  On March 7, 2002 Aileen finally sent me an email indicating that she had received the draft of the white paper and that she would review it.  Aileen made much of the review process in her group while I was there.  I waited for her feedback on the draft, but it never came.  Why then should she now be allowed to claim that she received a final copy from me, and it was poor quality?  She pounded into me that I would submit a draft to her for her review, she would comment on it and perhaps have Jill or others comment on it, send it back to me for corrections, and then I could finalize it.  When did any of that happen after she received the draft?  She is not accurately depicting what happened.

**Verna's review and comments:**

Verna has made it quite clear that her goal is to get rid of me, by any means necessary.  Stretching and/or completely obliterating the truth is a means to an end for her as it relates to me.

1.   Khadija was asked to analyze the LASER Systems Test Methodology and evaluate the possibility of automating some portions of the testing.

---

**OBJECTIVE 3:  Contribute to rotation team's success by providing work products that enhance the contributions of the Technology Architecture team to the Fannie Mae corporate entity.**

---

**RESULTS ACHIEVED:** The bulk of my work product for this rotation will be produced after this review is due.  To date my contributions have been the following:  1)  I have performed extensive research for my rotation tasks and have supplied much of that research to my rotation manager and my resources for my projects. 2) I created a project plan for my rotation tasks.  3)  I have met with numerous groups and individuals to get a "meeting of the minds" on ultimate goals regarding collaboration tools and cross-platform utilization.  4) I have assisted other team members (specifically Barbara Roberts and Paul Hsieh) with their tasks by providing my expertise and knowledge, and by introducing them to other FTEs who could provide additional in-house and industry knowledge to them.  5) I created the title, subject matter and format for "Mainframes + Client Servers = Mismatch or The Perfect Blend?", a Developers' Forum scheduled for 1/29/02. As the facilitator for this forum, I contacted affected management for buy-in on topic and approval of use of their resources.  I acquired internal & external resources for this forum.  To date I have performed a Herculean "sell" of this forum to all who would listen.  6) I created and delivered to rotation manager an outline for this forum and the Homesite advertisement for the announcement of the forum.  7) I created and will deliver today an outline for the white paper I am writing that will become a byproduct of the forum.  8) I contributed to the technology solution template on workplace collaboration using virtual meeting (I wrote the introduction and the security plan).  9)  I continue to perform research and development of technology solutions for workplace collaboration using collaborative development, remote presentation, and document collaboration.

**Manager's Comments (Aileen Morse)**
Khadija was assigned three goals during her rotation.
Goal 1. Assist in the development of technology solution templates for the following items:

* workplace collaboration
* operations tracking

Goal 2. produce a technology white paper on a subject that pertains to enterprise architecture.

Goal 3. participate in communications efforts to help get others involved in enterprise architecture and to help understand the vision.

Khadija was assigned a leadership role with respect to the two solutions templates that were due. There were existing models for these so that there should have been no ambiguity as to what needed to be delivered. It was expected that Khadija would, as a level 5 professional, ask if she had questions. Khadija was expected to  lead up the effort that would be supported by the rest of the team. Khadija's  results did not meet expectations.  In both cases, Khadija failed to understand the concepts that these areas encompassed. Khadija interpreted her leadership role to not only lead the work but the people as well. This caused contention among her peers. At the end of the effort, the templates had to be reassigned at the last moment so they could be completed on time because they were off-track and had not been completed. At this time, Khadija disengaged from the team and the process. Her first template was to have multiple parts and I have yet to see any evidence of work in that area. this is largely due, i believe, to her vacation and illness-related absence.  The rating for this goal is PME.

The other two goals are on track. Khadija  is putting a tremendous amount of energy and time into this developer's forum that  is both thought-provoking and interesting. Khadija  has shown leadership abilities in this area and has kept it on track.   The rating for these two goals are ME

Overall, I believe that khadija is talented, and has a great deal of enthusiasm and energy for what she believes in. I believe that she needs to work on her communications skills and to better understand and tolerate viewpoints that she does not agree with. I have spoken to her about this and she has been receptive to suggestions and criticism.

EXHIBIT-16(e)

| • Indicate how well the Success Qualities were demonstrated relative to this objective by using the appropriate mark below:<br>"+" -- strongly demonstrated<br>"x" -- adequately demonstrated<br>"–" -- needs development<br><br>• Leave blank the Success Qualities that are not applicable. | X | Teamwork and Valuing Others | X | Delivering Results |
|---|---|---|---|---|
| | + | Intellectual Honesty and Integrity | + | Customer Focus |
| | + | Critical Thinking | X | Interpersonal and Influencing Skills |
| | + | Accelerating Change | X | Project Management |
| | | Managing Performance | + | Motivating and Energizing Others |
| | | | | Developing People |

| For Success Qualities marked "-", explain what development is needed. | | | | | |
|---|---|---|---|---|---|

| Rating for Objective 3: | FEE | CEE | ME X | PME | DNM |
|---|---|---|---|---|---|

**Subject: Just checking...**
**Date:** Wed, 02 Apr 2003 12:30:18 -0500
**From:** "Khadija Duma" <khadija_duma@fanniemae.com>     **Internal**
**Organization:** Fannie Mae
**To:** Becky Detchon <becky_detchon@fanniemae.com>

Becky,

I called you a couple of times to see if you are alright.  I know that
sometimes dredging up hurtful memories makes it difficult to carryon
through the day.  I left a message for you that we could continue our
conversation about AABW at 3pm today, if you are available.  If not,
maybe tomorrow morning.  Page me and let me know.

Thanks.

Khadija

EXHIBIT-18



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1400 L Street, N.W., Suite 200
Washington, D.C. 20005
(202) 275-7377
TTY (202) 275-7518
FAX (202) 275-6834 & 0025

April 3, 2003

Khadija Duma
P.O. Box 1023
Washington, D.C. 20013

Dear Ms. Duma:

Enclosed please find copies of the charge of discrimination. In order for the Commission to investigate your allegations, you must sign and date these documents and return them to this office as soon as possible. Please sign and date the charge in the lower left-hand corner only. The copy of the charge with the words "CHARGING PARTY COPY" in the lower right corner is for your records.

Please note that the Commission cannot investigate your allegations until it receives a signed charge from you. Also, the charge filing period is not extended while your unsigned charge is in the mail. If you do not return the charge within 60 days, your file will be destroyed. If you decide that you still wish to file a charge, you are responsible for contacting this office and the intake process must be repeated in its entirety.

Please be advised that the law requires that charges of discrimination be filed with us within 300 days (in some cases 180 days) from the date the alleged discriminatory action occurred. If you have any questions, please contact me at (202) 275-0051.

Sincerely,

James J. LaRocca
Federal Investigator

Enclosure:
        Form 5 (Charge of Discrimination)

**Subject: Re: [Fwd: [Fwd: Medical Certification]]**
**Date: Mon, 07 Apr 2003 16:27:48 -0400**
**From: "Khadija Duma" <khadija_duma@fanniemae.com>     Internal**
**Organization: Fannie Mae**
**To: Anne Catanzarite <anne_catanzarite@fanniemae.com>**

Anne,

I pre-registered for both procedures today by telephone, as required. However, I am still apprehensive about having the procedures done.  I misplaced my prescription for
the procedures and my medical paperwork (which is why I wanted you to fax me a copy of the documentation that I presented to you).  I was in bed all weekend because of the pain.  I did not leave my house.   I need relief, but I don't want more pain in order to get relief.

Khadija

Anne Catanzarite wrote:

> Khadija:
>
> Please let me know the fax number to send the medical documentation that
> your doctor completed for you. Also, what have you decided regarding the
> myelogram?
>
> regarding this forwarded message, please submit time sheets to me when
> you have to take any sick Leave due to your current medical condition as
> identified by your doctor.
>
> Anne
>
> -------- Original Message --------
> Subject: [Fwd: Medical Certification]
> Date: Mon, 07 Apr 2003 15:13:11 -0400
> From: Anne Catanzarite <anne_catanzarite@fanniemae.com>
> Organization: Fannie Mae
> To: Verna F Robinson <verna_f_robinson@fanniemae.com>,Lisa A Kober
> <lisa_a_kober@fanniemae.com>
>
> Attached is the FMLA document for intermittent use for certified medical
> condition. It was  inadvertently left off prior email.
>
> Anne
>
> -------- Original Message --------
> Subject: Medical Certification
> Date: Mon, 07 Apr 2003 14:22:54 -0400
> From: Anne Catanzarite <anne_catanzarite@fanniemae.com>
> Organization: Fannie Mae
> To: Verna F Robinson <verna_f_robinson@fanniemae.com>,Lisa A Kober
> <lisa_a_kober@fanniemae.com>
>
> This is to notify you that Khadija Duma has submitted medical
> documentation certifying a medical condition that may cause her to use
> Sick Leave intermittently for medical appointments and illness. She will
> submit time sheets for all absences related to this medical condition so
> FMLA can be tracked.
>
> Anne
>

EXHIBIT-20

# DYCK ◇◇◇ O'NEAL

## ——— INCORPORATED ———

August 27, 2003

Mr. Khadija Duma
1840 Massachusetts Avenue SE
Washington, DC  20003

RE:  New Account #: 745609226
Fannie Mae Employee #: 09226

Dear Mr. Khadija Duma:

Fannie Mae has selected Dyck-O'Neal, Inc. as the new servicer to manage
the Fannie Mae EAH Loan Program.  Dyck-O'Neal, Inc. has acquired your EAH
Note from Fannie Mae and now owns it.

Dyck-O'Neal, Inc. has been informed by Fannie Mae that you are no longer a
Fannie Mae employee.  While a Fannie Mae employee, you participated in the
Employer-Assisted Housing (EAH) program.

Under the provisions of your promissory note, you are responsible for
repayment of your EAH loan.  You are no longer eligible for principal
forgiveness.  Your note now amortizes over 96 months, less the number of
months that you have paid interest through payroll deduction.

As of your termination date, your EAH loan balance is 13,011.67.  Your
interest rate is 5.910.  The number of monthly payments remaining is 41.
Your monthly payments of 45.72 will begin .  The accrued interest
that Fannie Mae will be forgiving is $.

Please note that under the terms of your EAH Benefit Agreement and your
promissory note ("Note") that you must make each scheduled payment on or
before its due date until you have paid in full the principal and interest
and any other charges that you may owe under the Note.  We will apply each
payment on the date we receive it.  We will compute and charge interest
from the date you make each payment to the date that you actually make
your next payment, without regard to the date that you are scheduled to
make your payments.  Early payments may decrease the total amount of
interest you must pay on the Note.

Effective immediately, please remit your payments to Dyck-O'Neal, Inc.,
P.O. Box 735, Addison, TX 75001-0735.  Please make all checks payable
to "Dyck-O'Neal, Inc.", or "DONI", to ensure timely processing to your
account.

Enclosed are your coupons and envelopes to be sent with your payments.
Also enclosed is an amortization schedule showing how your payments will
be applied.

We look forward to servicing your loan.  Should you have any questions, please
contact the undersigned, or call Sheila Lopes, EAH Program Administrator
at Fannie Mae, at 202-752-7653.

Sincerely,

Cory Faulkner- ext 232
Customer Service Manager
Email: cfaulkner@dyckoneal.com

The following statement is a requirement of Federal Law:
This communication is from a debt collector.  This firm is attempting
to collect a debt, and any information obtained will be used for that
purpose.

NS

**Subject: Re: My next scheduled orthopedic exam is 8am 3/25/03**
**Date:** Fri, 28 Mar 2003 11:36:00 -0500
**From:** Khadija Duma <khadija_duma@fanniemae.com>
**Organization:** Fannie Mae
**To:** Anne Catanzarite <anne_catanzarite@fanniemae.com>
**CC:** Verna F Robinson <verna_f_robinson@fanniemae.com>,
Karen F Mychalus <karen_f_mychalus@fanniemae.com>,
Lisa A Kober <lisa_a_kober@fanniemae.com>


Anne,

After reviewing the xrays that were taken this morning along with my MRI film, the
spine specialist completed the documentation certifying the condition.  I asked him
to allow me to return to work
because of the outstanding deliverables I have due. I will drop the paperwork off to
you when I am on my way home today --- traffic permitting; otherwise, I will drop
them off on Monday.

I am scheduled to have a medical procedure performed on 4/8/03 in the morning.  They
expect the procedure to take at least half a day.  If I am released on that day I
will have a follow-up on Thursday
4/10/03 at 9am.


Khadija


*******************************************************************************

Anne Catanzarite wrote:

> *Khadija:*
>
> *I just received this message after we talked. As we discussed, please submit the
Medical Documentation*
> *(form 42) certifying your condition after your meeting with your physician(s) this
week.*
>
> *Anne*
>
> *Khadija Duma wrote:*
>
> > *Verna,*
> >
> > *As I indicated when I stopped by your office this morning to let you*
> > *know that I was here, the orthopedic surgeon brought in a spine*
> > *specialist this morning to look at my MRI films and to exam me. After we*
> > *discussed my films I told him that I had to get to work because I had a*
> > *deliverable due today.  They wanted me to come back in this afternoon by*
> > *3pm for another exam.  I told them that I was not certain that I could*
> > *get back by then.  I told them that I would call back this afternoon and*
> > *let them know.  I made an appointment for Friday morning at 8am in case*
> > *I am not able to get back there by 3pm today.*
> >
> > *Khadija*
> >
> > *Khadija Duma wrote:*
> >
> > > *I should be out of GW by 9:30am - 10am, if the doctor is running late*
> > > *which is sometimes the case due to emergencies, I will call you from*
> > > *the pay phone in the waiting area.  If you are not in your office when*
> > > *I call, if the call is necessary, I will leave a voicemail message for*

```
> > > you and page you.  Without traffic problems I should be here by
> > > 10:30am - 11am.
> > >
> > >
> > ****************************************************************************
> > >
> > > Verna F Robinson wrote:
> > >
> > >> Khadija,
> > >>
> > >> Thank you for the notice.  Do you have an estimate of the time that
> > >> you will arrive to the office?
> > >>
> > >> Verna
> > >>
> > >> Khadija Duma wrote:
> > >>
> > >> > Since the exam is at George Washington University Hospital
> > >> > Ambulatory Care I will go to that appointment from home before
> > >> > coming to Herndon.
> > >>
```

# Short Term Disability and Extended Leave Authorization
**Authorization ID: 2328**

**Employee Name:** Duma,Khadija      **Mail Stop:** 5H5W05      **Work Phone:** (703) 833-5137

**Employee Title:** Sr Business Manager      **Supervisor:** Robinson,Verna F      **Home Phone:**

**Hire Date:** 6/26/2000      **Cost Center:** 060      **Emp. ID:** 09226

| Status: | From: | To: | Comment: |
|---|---|---|---|
| [91001] Sick Leave (if authorized by supervisor) | 5/23/2003 | 5/29/2003 | |
| [91002] Short-Term Disability (STD) | 5/30/2003 | 5/30/2003 | Employee returned to work on 6/2/2003 |
| [91002] Short-Term Disability (STD) | 6/4/2003 | 9/12/2003 | Medical Status Update due. |

**Return Date and Comments:** Medical Status Update due Undetermined at this time. When actual date of return is determined, given.

**Note:** Timesheets must continue to be submitted for the duration of the absence.

## COMMENTS TO EMPLOYEE:
The Medical Status Update has been received however, additional information is needed and is being requested from your health care provider. Therefore, STD is being authorized for only two more weeks at this time.

## INSTRUCTIONS TO SUPERVISOR:
Please process employee's time sheets as reflected on this form. Thank you.

**Job Limitations:**

**Signature:** Patricia Kirsch, RN
**Date:** 8/27/2003

## MEMORANDUM

**TO:**        PATRICIA SIMMS, VIA FAX AND CERTIFIED MAIL

**FROM:**    KHADIJA DUMA

**SUBJECT:** HEALTH AND WORK LIFE SECTION'S UNREASONABLE HANDLING OF MY SHORT TERM DISABILITY (STD) CERTIFICATION

**DATE:**     9/9/2003

**CC:**         DR. SOS MBOIJANA, VIA HAND DELIVERY

DR. WARREN YU, VIA FAX

EEOC

D.C. SUPERIOR COURT, JIC

PATRICIA KIRSCH, VIA FAX

TIMOTHY HYDE, VIA FAX

KUHN TROY, VIA FAX

---

Each time that I have tried to talk to you about my Short-Term Disability (STD) certification you yell at me and appear to be angry with me. This past Friday I asked you to stop yelling at me. You then lowered your voice, but your tone was still angry. I have been civil and accommodating every time I have dealt with anyone in your office. I have left several messages for Pat Kirsch, but she has not returned my calls I unsuccessfully tried to reach Kuhn when I could not reach Pat Kirsch. ( I told Kuhn, Pat Kirsch and you that my telephone only rings in one location in my home and if I am not able to answer the telephone my Caller ID will register the call and I will return calls that are listed on it.) I cannot get the information and cooperation that I need from you and your staff so that I can ensure proper handling of my STD certification. Your behavior has been unreasonable and, perhaps, unethical. I have to call other departments to find out what authorizations, if any, you have submitted for my STD certification.

As I previously told Kuhn, Pat Kirsch and you Dr. Warren Yu recommended both neck surgery and back surgery during my last visit to his office. He said that he wanted to perform the neck surgery first. He said that the back surgery was more complicated. Dr. Yu does not state that the neck surgery will allow me to return to work because the back surgery would still be necessary. His letter, which I provided to you, suggests that you should call him with any additional questions you may have. Dr. Mboijana told your consulting doctor, Dr. Chase, to call Dr. Yu during their conversation, if he needed additional information regarding Dr. Yu's recommendations. It seems that your consulting doctor had not seen the documentation package that I had presented to your office before his conversation with Dr. Mboijana. I have complied with every request for documentation that I have received from anyone in your office. My research on the neck surgery shows, as I have discussed with Kuhn, Pat and you, that I could end up worse than I am now as a result of the surgery. I wanted a second opinion and discussed this with Dr. Mboijana and Pat Kirsch. As a matter of fact, Pat Kirsch recommended that I get a second opinion during an earlier conversation before I told her that Dr. Mboijana and I thought that I should get a second opinion.

Dr. Mboijana's last status certified me through 9/30/03 so I thought that I had time to find a doctor and get a second opinion. Your actions deny me that opportunity. I understand that you only authorized payments through 9/12/03 for me. The STD payments are my sole source of income. You seem to have a rather cavalier attitude as you yank those payments from me. There is no one at Fannie Mae to help me deal with you. I am, therefore, left to seek assistance from external sources. I have been trying to get answers to my questions for some time now. I need to know the following from you no later than 8am tomorrow morning:

1.  What is the current status of my STD certification?

2.  If you have discontinued STD payments to me beyond 9/12/03, what are the detailed reasons for this stoppage?

3.  What action is required on my part to cure any deficiency that you deem responsible for the stoppage of STD payments to me after 9/12/03; and, when would my payments resume?

4.  When are my STD payments exhausted?  If my STD payments need to be and are reinstated, what steps do I and my health providers need to take to ensure that there is no gap between STD and Long-Term disability payments to me?

You have my telephone number.  Please call me with your responses no later than 8am tomorrow morning.  There are many days when the pain is almost too great for me to get out of bed for anything.  You have harassed me and there is no basis for it.  I called Dr. Mboijana's office after the difficult conversation I had with you last Friday morning.  I was able to get an appointment for that afternoon for a consultation with him.  Dr. Mboijana provided the additional information that you requested, even though the request came to him on a holiday weekend and he sees many patients.

Seeking injunctive relief may not be the best remedy for me, but it is the only one that I see as viable under the circumstances.  It causes a major hardship for me to go that route.

I finally reached Pat Kirsch today.  She confirmed her understanding that two surgeries have been recommended.  She states that since I have been told of the office there has been no change in my status..."from month to month there has been no change".  She states that my status is always the same so my case is under review and a decision regarding continued payments will be made by 9/12/03.  My understanding from the payroll department is that authorization for payments beyond 9/12/03 would need to be received in the payroll office no later than tomorrow morning in order to be effective beyond 9/12/03.

It seems that I am being penalized for not being well.  This does not appear to be the same kind of treatment everyone else receives.  Fannie Mae HR and Health and Work Life provided me with copies of the STD policies.  No where in those policies did it state that you would be denied payments, if you did not get better.  However, for all intents and purposes, I have been told that unless I show medical progress (got better) I would be penalized.  If that has always been the case with Fannie Mae policy why wasn't I informed earlier, what is the purpose of long-term disability insurance, why have I paid for it all this time, and why does Fannie Mae provide it?

## MEMORANDUM

**TO:**      PATRICIA KIRSCH, MARGO MCKAY, PATRICIA SIMMS, LISA KOBER, DR. SOS MBOIJANA

**FROM:**    KHADIJA DUMA *(kd)*

**SUBJECT:** SECOND OPINION AND UPCOMING SURGERY

**DATE:**    9/22/2003

**CC:**      EEOC

### RESPONSE TO FANNIE MAE ULTIMATUM

Seemingly without regard to my reservations and/or concerns Fannie Mae, via certified letter I received from Patricia Simms, issued an ultimatum to me regarding my Short-term disability payments and my treatment for my current disabilities. Based upon that ultimatum I have decided to have the neck surgery.

I had an appointment last Wednesday with Dr. Joseph Linehan for the second opinion that I wanted. He took complete xrays including CT scan followed by an examination. He concurs with Dr. Yu regarding both surgeries. I asked for a report. His nurse, Esther, told me that their typist is only in the office two days a week (Tuesday and Thursday), and she could not guarantee that the report would be available to me by the deadline set by Patricia Simms. The inclement weather last week has made it more difficult to get that report from them by Patricia Simms' deadline. When I left Dr. Linehan's office and went back to George Washington University Hospital Medical Faculty to return the film I had picked up from them that morning for Dr. Linehan's review, I met Dr. Yu in the lobby. I discussed Dr. Linehan's findings, Dr. Yu's conversation with Dr. Chase, and Fannie Mae's ultimatum; then I decided to go ahead with the first surgery. Dr. Yu said that the surgery had to be scheduled at least four weeks in advance. I went to his office to talk to his secretary about scheduling the surgery, but she was unavailable. I was unable to reach her Wednesday afternoon, Thursday or Friday. I scheduled the surgery with his secretary this morning. George Washington University Hospital requires the surgery to be scheduled at least four weeks out from the date of request for a number of reasons (so far as I can tell most of them are related to administrative details for the surgery).

I have follow-ups appointments with both Dr. Yu and Dr. Mboijana to discuss the first surgery in greater detail.

*The Surgery is Scheduled for 10/22/03. (kd)*

# Short Term Disability and Extended Leave Authorization
**Authorization ID: 2328**

**Employee Name:** Duma,Khadija                  **Mail Stop:** 5H5W05                    **Work Phone:** (703) 833-5137
**Employee Title:** Sr Business Manager          **Supervisor:** Robinson,Verna F         **Home Phone:**
**Hire Date:** 6/26/2000                         **Cost Center:** 060                     **Emp. ID:** 09226

| Status: | From: | To: | Comment: |
|---|---|---|---|
| [91001] Sick Leave (if authorized by supervisor) | 5/23/2003 | 5/29/2003 | |
| [91002] Short-Term Disability (STD) | 5/30/2003 | 5/30/2003 | Employee returned to work on 6/2/2003 |
| [91002] Short-Term Disability (STD) | 6/4/2003 | 10/24/2003 | |

**Return Date and Comments:**    Undetermined at this time. When actual date of return is determined, given.    Medical Status Update due

**Note:** **Timesheets must continue to be submitted for the duration of the absence.**

## COMMENTS TO EMPLOYEE:

Health Services has received supporting medical documentation to extend your STD through 10/24/2003. Enclosed is a Medical Status Update form that must be completed by your health care provider and faxed to 703-833-0432 prior to 10/24/2003.

## INSTRUCTIONS TO SUPERVISOR:

Please process employee's time sheets as reflected on this form. Thank you.

**Job Limitations:**

**Signature:** Patricia Kirsch RN
**Date:** 9/25/2003

## MEMORANDUM

**TO:**      PATRICIA SIMMS

**FROM:**    KHADIJA DUMA

**SUBJECT:**  "LYING AND REWRITING HISTORY 101" – A FANNIE MAE INTERNAL COURSE

**DATE:**    10/13/2003

**CC:**      PATRICIA KIRSCH, MARGO MCKAY, VALERIE MOODY, LISA KOBER, ANNE ENGLISH, MIKE
            FRIEDMAN, EEOC

---

### RESPONSE TO "LYING AND REWRITING HISTORY 101"

Late yesterday evening I picked up your letter to me that was dated September 26, 2003. Please provide a copy of this response to Lisa Kober since I do not have a fax number for her. I briefly spoke to Margo McKay today and I have asked her to provide a copy of this response to Valerie Moody, Anne English and Mike Friedman. I will fax a copy of this response with additional documentation to Patricia Kirsch.

Based upon my experiences with Fannie Mae I have come to the dismal conclusion that "Lying and Rewriting History 101" is a management strategy at Fannie Mae that is often used to discredit and harass me since the truth defeats management's ultimate goal. At this time, I am not going to provide a tic for tac response to your letter — I am overwhelmed with pain and complications associated with my pre-operation screenings. There is significant concern that my heart may not tolerate the three-hour surgery on my neck that is currently scheduled for October 29, 2003; also, I am not trying to provide testimony and a deposition for Fannie Mae's legal department.

Webster defines option as "1) the power or right of choosing; 2) something that may be chosen; choice; 3) the act of choosing; 4) part of a legal agreement giving one the right to buy property, use services, etc. within a specified time." I suspect that any reasonable person would agree with Webster's definition of option. Nowhere in said definition is there a connotation or denotation that renders ultimatum, directive, demand and/or mandate as synonymous with the word option.

It is an outrageous allegation from you to assert that I had not in some cases finished recommended non-surgical treatment options and had not pursued other non-surgical treatment options recommended to me by my physicians. The following information has been known to you and your staff for some time. I have freely and frequently discussed these items with Fannie Mae's Health Work Life team and my health providers. The fact that you continue to create hardship situations for me to force repetitious explanations from me is harassment. The following items are true:

1.  After his initial examination of me accompanied with his review of film Dr. Yu recommended two surgeries --- one for my neck and one for my back.

2.  As a direct result of the risks to me associated with those surgeries I asked him to recommend alternatives that were not invasive, and I asked him for referrals for non-surgical alternatives that I wanted to explore (i.e., acupuncture, physical therapy and massage therapy).

3.  When I received the referral from Dr. Yu for the CT Myelogram I promptly made an appointment at G.W. Hospital to have the procedure, as it had been explained to me, performed. I arrived early at G.W. Hospital for my appointment. I was in a hospital gown on the hospital gurney waiting for the procedure to begin when I discovered that 1) the procedure was not as I understood it to be, 2) that a doctor was not going to perform the procedure (they wanted me to allow a resident to poke around for an hour or more with a huge needle while he tried to find exactly where the needle should go --- he was trying to learn how to perform the procedure), and 3) the CT Myelogram was basically a spinal tap (somehow no one saw fit to inform me of this major fact prior to my being there even though I had asked many detailed questions regarding the nature

of the procedure). Based upon those three concerns/facts I chose to not have the CT Myelogram performed. I got dressed and went home. I discussed these events with Dr. Yu, Dr. Mboijana and your staff.

4.     Dr. Yu provided me, at my request, with a referral for the nerve root blocks as an alternative. I made an appointment at G.W. Hospital's pain center. During her examination of me a detailed explanation from Dr. Chin revealed that there was little difference between the CT Myelogram and the nerve root blocks. I chose not to proceed with the nerve root blocks. I still wanted some less invasive or non-invasive treatment. Dr. Chin provided me with a referral to G.W. Hospital's Alternative Medicine center. I made an appointment and went to the center. The center does not accept insurance and wanted an initial payment of approximately $600.00 dollars (six hundred dollars) from me, but I could not afford to make that payment. I discussed these events with Dr. Yu, Dr. Mboijana and your staff.

5.     I stopped going to physical therapy, massage therapy, and acupuncture treatments after both Dr. Yu and Dr. Mboijana told me that there did not seem to be any benefit to me in continuing with those treatments. The traction offered temporary relief for the neck only, but there was no sustained benefit. I discussed these events with your staff.

What are your definitions of finished and pursued? Your apparent definitions and usage of the words finished and pursued are subject to suspect. It should be abundantly clear to a reasonable person that I both finished and pursued all options and recommendations that I requested. I receive ongoing conservative treatment via pain medication. However, that is not sufficient for you. You have used my short-term disability payments to taunt, bully and harass me. You and your staff made it clear to me that without surgery my income would cease — it is not my choice it is your choice for me. Even in Dr. Linehan's second opinion he said that I could choose to live with it. You have constructively taken that choice away from me.




# Short Term Disability and Extended Leave Authorization
**Authorization ID: 2328**

| | | |
|---|---|---|
| **Employee Name:** Duma,Khadija | **Mail Stop:** 5H5W05 | **Work Phone:** (703) 833-5137 |
| **Employee Title:** Sr Business Manager | **Supervisor:** Robinson,Verna F | **Home Phone:** |
| **Hire Date:** 6/26/2000 | **Cost Center:** 060 | **Emp. ID:** 09226 |

| Status: | From: | To: | Comment: |
|---|---|---|---|
| [91001] Sick Leave (if authorized by supervisor) | 5/23/2003 | 5/29/2003 | |
| [91002] Short-Term Disability (STD) | 5/30/2003 | 5/30/2003 | ee RTW on 6/2/2003 but resumed STD on 6/4/2003 |
| [91002] Short-Term Disability (STD) | 6/4/2003 | 11/24/2003 | STD ends |

**Return Date and Comments:**    11/25/2003   STD ends 11/24/2003 - LTD pending

**Note: Timesheets must continue to be submitted for the duration of the absence.**

## COMMENTS TO EMPLOYEE:

Health Services has received supporting medical documentation to extend your STD through 11/24/2003. Please be advised, this completes your 26 weeks of Short-Term Disability.

Please feel free to contact me if you have any questions. 703-833-5651.

## INSTRUCTIONS TO SUPERVISOR:

Please process employee's time sheets as reflected on this form. Thank you.

**Job Limitations:**

**Signature:** Patricia Kirsch RN
**Date: 10/23/2003**

Confirmation Report — Memory Send

Page      : 001
Date & Time: 26-Feb-2004  04:25pm
Line 1    : 202-543-8393
Line 2    :
Machine ID : Kinko's

| | | |
|---|---|---|
| Job number | : | 279 |
| Date | : | 26-Feb 04:24pm |
| To | : ☎2022756834 |
| Number of pages | : | 004 |
| Start time | : | 26-Feb 04:24pm |
| End time | : | 26-Feb 04:25pm |
| Pages sent | : | 004 |
| Status | : | OK |

Job number     : 279          *** SEND SUCCESSFUL ***

# FAX COVER SHEET

**KiNKO'S**
Capitol Hill
715 D Street SE | Washington, DC 20003-1146
Tel: [202] 547-0421 | Fax: [202] 543-8393

Number of pages: _3_

Date: 2/26/04

To: Attn. Mr. Silvro Fernandez, Deputy Director

Company: EEOC

Fax #: (202) 275-6834

From: Khadija Duma

Company: n/a

Tel #: (202) 546-6281

Comments: Mr. Fernandez,
Thank you for your cooperation
and assistance in this matter.
My recovery from spinal colum.
Surgery (a surgery I did not want in
Fannie Mae threatened to withhold my
disability payments unless I had this
risky surgery) has not gone well. I
have been hospitalized twice (including
two days after my release from su
after the surgery) on an emergency
basis. I am abit as well as betta.

**kinko's BEST PRICE PROMISE**

said I would be by now.
Due to pain I am not very mo
K. Duma

# FannieMae

DATE:      May 21, 2003

TO:        Khadija Duma

FROM:      Dror Oppenheimer
           Vice President-Asset Development & Management

Subject:   Agreement and General Release

---

Khadija, in order to address your work status and voluntary resignation from employment with Fannie Mae, and to resolve any and all possible claims related to your employment between you and Fannie Mae, Fannie Mae is offering you a Separation Agreement ("Agreement"), that is attached.  You have through **June 11, 2003** to review and sign the Agreement.   Between now and June 11, 2003, I encourage you to read the Agreement thoroughly and to consult with an attorney.

You are strongly encouraged to consult with an attorney before signing the Agreement. Fannie Mae will not be responsible for any costs you incur in consulting with an attorney. You also are encouraged to meet with your Human Resources Account Team Representative to discuss the Final Warning and the VSO.

The information in the Agreement is confidential and should not be discussed with other employees.

Please sign below to acknowledge that you have received both this memorandum and the Agreement.  Your signature indicates only your receipt, and does not indicate that you have decided to accept or decline the VSO.

Upon signing the Agreement, please deliver the original to Lisa Kober in Human Resources. Should you or your attorney have questions concerning this Agreement, please contact Margo McKay in the Legal Department at 202 752 3772.  If your questions are related to your employment, please contact Lisa at 703 833 5642.

Please acknowledge your receipt of this memorandum and your receipt of the Separation Agreement by signing below.

_____          _____
Khadija Duma                                          Date

 **FannieMae**

**VIA CERTIFIED MAIL/RETURN RECIEPT REQUESTED**

August 18, 2003

Khadija Duma
P.O. Box 1023
Washington, DC  20013

Dear Khadija:

As you know, you have been out on extended leave from May 23, 2003 to the present. This leave has been designated as leave under the Family and Medical Leave Act of 1993 (FMLA) and the District of Columbia Family and Medical Leave Act (DCFMLA).  However, your rights under both will be exhausted as of August 28, 2003.

According to the Health Services unit, your health care provider has not indicated a return to work date. You may continue to take leave and receive your salary to the extent permitted under Fannie Mae's Short-Term Disability (STD) program, as long as you provide medical documentation supporting your continued need for a leave of absence. However, Fannie Mae cannot guarantee that there will be a job available for you when you are able to return to work.

Please let us know if there is anything Fannie Mae can reasonably do to assist you in returning to work.  If you would like to discuss the possibility of a reasonable accommodation, please contact Health Services.  In the event that you do not believe you can be accommodated, or if it is determined that Fannie Mae is unable to accommodate your condition, Fannie Mae may not be able to continue to hold your position open, and we may begin looking for an individual to replace you.

If you cannot return to work and your position is filled, you will have 60 days in which to secure another available position within Fannie Mae, consistent with your skills and qualifications, once you are released to return to work. Placement in a new position is not guaranteed, nor can Fannie Mae guarantee that placement in an available position will be comparable to your current level of employment.  During this 60-day period I will help you identify the job vacancies for which you may apply.  Please see the attached policy for more information.

As you will recall, you received a Voluntary Separation Option agreement on May 21, 2003.  Once you are released to return to work you will have twelve days remaining of the 21-day period for consideration of the agreement.  The twelve days will run concurrently with the 60-day period described above – both are effective with the date you are released to return to work.

Please continue to provide the requested information concerning your medical updates and anticipated return to work date to Health Services.  You can reach Health Services at (202) 752-3502 or 1-800-752-7554.  If you have any questions concerning your employment status, please contact me at (703) 833-5642.

Sincerely,

Lisa A. Kober
HR Talent Team Manager

c:       Health Services
         Verna Robinson, Manager



**UnumProvident**

June 2, 2004

KHADIJA DUMA
PO BOX 1023
WASHINGTON, DC 20013

RE:   Duma, Khadija          DOB: ~~████████████~~
      Claim Number:          932587
      Policy Number:         531350

Dear Ms. Duma:

After completing our review of your disability claim, we regret that we are unable to approve your request for benefits.

As you may know, your employer's policy states:

"*HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 36 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."

"Material and substantial duties means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified."

Unum Life Insurance Company of America
The Benefits Center
PO Box 9500
Portland, ME 04104-5058
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unumprovident.com

1242-03

Claimant Name: Khadija Duma     Claim #: 932587

"Regular occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."

Our records show that you have been out of work since May 23, 2003 due to Cervical Radiculopathy. As a result of this condition, you underwent an Anterior Discectomy and Fusion on October 29, 2003.

Information received from Dr. Mboijana indicates that you are still treating with Dr. Yu and attending water aerobics. An office note dated March 16, 2004 indicated that your pain control was adequate and you should continue with water aerobics. Dr. Mboijana opined on March 23, 2004 that you were capable of only 2 hours of sedentary capacity with restrictions of no lifting with the right hand.

Dr. Yu provided a Supplemental Statement dated March 23, 2004. He indicated that you were capable of lifting up to 15 lbs with no repetitive use of the right upper extremity. The last office not provided and dated February 6, 2004 indicates you were fused anteriorly and the hardware was in position. You continued to complain of pain though it was improved from your pre-operative status. Dr. Yu indicated your pain was primarily myofascial and you had been referred for formal therapy and he anticipated continued improvement in the next six to nine months. Dr. Yu indicated that you are capable of 8 hours of sedentary work capacity. Dr. Yu also indicated that you are capable of using your right upper extremity for tasks that require simple grasping and fine manipulation.

Your claim was referred to a Clinical Consultant who conducted a review on April 21, 2004 of the office treatment notes forwarded by your care providers and opined that the objective medical evidence supports the restrictions and limitations outlined by Dr. Yu, which indicates you are capable of performing in the sedentary range of physical demands.

A Certified Rehabilitation Counselor reviewed the restrictions and limitations outlined above and compared them to your occupational requirements. It was determined that your occupation requires reaching and handling on an occasional basis and is performed at the sedentary range of physical demands.

You submitted additional information from Dr. Yu and this information was once again reviewed by a Clinical Consultant in our office on May 24, 2004. The Clinical Consultant opined that the original restrictions and limitations that indicated sedentary capacity are appropriate and expected given your discectomy and fusion. The office notes indicate a steady improvement consistent with the expected recovery from this type of procedure. The updated restrictions and limitations from Dr. Yu do not correspond with any changes in therapy, additional diagnostic workups, or referrals for assistance in your rehabilitation.

Based on the above vocational and medical information, you are capable of performing your occupation as a Senior Business Manager. Therefore, you no longer satisfy the above definition of disability and your claim has been closed.

If you have additional information to support your request for disability benefits, it must be sent to my attention for further review at the address noted on this letterhead, within 180 days of the date you receive this letter.

1242-03

EXHIBIT-32(a)

# DYCK ⬤⬤⬤ O'NEAL
## —INCORPORATED—

March 30, 2005

Khadija Duma
P.O. BOX 1023
Washington, DC 20013

### S T A T E M E N T   O F   A C C O U N T

Thank you for your recent payment. It was received on 03/25/05 and applied as follows:

| | |
|---|---|
| Amount of Payment Received | 91.44 |
| Amount Applied to Principal | 0.00 |
| Amount Applied to Interest | 91.44 |
| (Interest Paid Through 02/03/05) | |
| Amount Applied to Late Fee | |
| Principal Balance | 10,409.34 |
| Accrued Interest | 92.64 |
| Late Fees | 0.00 |
| Payoff Balance as of March 30, 2005 | 10,501.98 |
| Interest Rate | 5.910% |
| Daily Periodic Amount | 1.68 |

If you have any questions regarding any portion of this statement, please feel free to give us a call at the number below.

This communication is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Khadija Duma
P.O. BOX 1023
Washington, DC 20013

| | |
|---|---|
| Regular Payment | 45.72 |
| Amount Due | 45.72 |
| Late Fee | 0.00 |
| **Total Due** | **45.72** |
| Payment Due Date | 05/01/05 |
| Amount Paid | $_____ |

745609226-01

Mail Payment to:
Dyck-O'Neal, Inc.
P.O. Box 13370
Arlington, TX 76094-0370

81    NS

---

P.O. Box 13370, Arlington, Texas 76094
3214 W. Park Row Drive, Arlington, Texas 76013
(817) 588-6450 (800) 418-9401 FAX (817) 588-6477

# DYCK O'NEAL
## INCORPORATED

March 30, 2005

Khadija Duma
P.O. BOX 1023
Washington, DC  20013

### S T A T E M E N T  O F  A C C O U N T

As of the date of this communication, the following represents the
status of your account:

| | |
|---|---|
| Current Due Date | 05/01/05 |
| Regular Monthly Payment | 45.72 |
| Interest Rate | 5.910% |
| Principal Balance | 10,409.34 |
| Payoff Balance 03/28/05 (includes Late Fees, if applicable) | 10,498.61 |

Please send your next payment by the due date shown along with the
bottom portion of this letter to assure proper crediting to your account.

If you have any questions regarding any portion of this statement,
please feel free to call our offices.

This communication is an attempt to collect a debt and any information
obtained will be used for that purpose.  This communication is from a
debt collector.

---

Khadija Duma
P.O. BOX 1023
Washington, DC  20013

| | |
|---|---|
| Amount Due | 0.00 |
| Late Fee | 0.00 |
| Total Due | 0.00 |

Payment Due Date  05/01/05

Amount Paid       $_____

Mail Payment to:

745609226-01

Dyck-O'Neal, Inc.
P.O. Box 13370
Arlington, TX  76094-0370

81    NS

P.O. Box 13370, Arlington, Texas 76094
3214 W. Park Row Drive, Arlington, Texas 76013
(817) 588-6450 (800) 418-9401 FAX (817) 588-6477

 **FannieMae**

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892

VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED

February 2, 2005

Khadija Duma
PO Box 1023
Washington, DC 20013

Dear Mrs. Duma:

As you know, you have been out on extended leave since May 23, 2003. This leave was designated as leave under the Family and Medical Leave Act of 1993 (FMLA) and the District of Columbia Family and Medical Leave Act (DCFMLA). However, your rights under the FMLA and DCFMLA were exhausted as of September 1, 2003 and your Short Term Disability (STD) coverage ended on November 24, 2003. Your claim to go on Long Term Disability (LTD) was pending as of November 24, 2003. A letter was sent to Fannie Mae by the LTD vendor stating that your claim was closed effective April 27, 2004.

As you were previously notified, your position with Fannie Mae was eliminated. At this time, you have 60 days in which to obtain a release from your doctor to return to work and secure another available position within Fannie Mae, consistent with your skills and qualifications. Placement in a new position is not guaranteed, nor can Fannie Mae guarantee that placement in an available position will be comparable to your most recent level of employment. During this 60-day period I will help you identify the job vacancies for which you may apply. If you are unable to be released to return to work or are unable to find a new position within the company in 60 days, your employment will be terminated effective **April 1, 2005.**

If you have any questions concerning your employment status, please contact me at (703) 833-2190. If you have any questions concerning your benefit coverage if your employment is terminated, please contact the HR Service Center at (703) 833-2222.

Sincerely,

Kendrick J. Cox
ESO Talent Team Representative

Cc: HR Service Center

EXHIBIT-34

K H A D I J A   D U M A

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **TO:**<br>Damien Stewart | **FROM:**<br>Khadija Duma |
| **COMPANY:**<br>Fannie Mae | **DATE:**<br>8/14/2007 |
| **FAX NUMBER:**<br>(202) 752-3627 | **TOTAL NO. OF PAGES INCLUDING COVER:**<br>2 |
| **PHONE NUMBER:**<br>(202) 752-6871 | **SENDER'S REFERENCE NUMBER:**<br>FNMA Rehire01 |
| **RE:**<br>Rehire status | **YOUR REFERENCE NUMBER:**<br>n/a |

☐ **URGENT**   ☐ **FOR REVIEW**   ☐ **PLEASE COMMENT**   ☐ **PLEASE REPLY**   ☐ **PLEASE RECYCLE**

**NOTES/COMMENTS:**
Please see attached.

# MEMORANDUM

**TO:**      DAMIEN STEWART

**FROM:**   KHADIJA DUMA

**SUBJECT:**  REHIRE STATUS

**DATE:**    8/14/2007

**CC:**       DAN MUDD VIA EMAIL, FILE

## SUMMARY

Yesterday I called Human Resources to find out what my rehire status was and whether there were any Fannie Mae impediments to my rehire. I was told that there did not seem to be any impediments to my rehire. Today I called Human Resources recruiting and asked the same questions. Kelly Williams told me that I needed to talk to legal services and she gave me the name and telephone number for you. I called you and explained that since the circumstances surrounding my separation from Fannie Mae ultimately seemed to center around a mistake made by my orthopedic spinal surgeon in paperwork he filled out for Unum Provident which indicated I was physically able to return to work when I was not physically able to return to work that it might be a little easier for me to ask Valerie Moody my questions since she had been actively participant in the issues surrounding my separation and other issues. I had spoken to Ms. Moody on the telephone several times. So it came to me as a complete surprise when I spoke to her today and she told me that she had no memory of my name or of me. The last time that I spoke to Ms. Moody (Oct. 2006) she asked for my telephone number, it turned out that it was the same number she already had and she wanted to talk to me about my last contact with her office; at that point, she seemed conciliatory. Today Ms. Moody tersely told me that there was a process in place for former employees to apply for positions through Human Resources recruiting. I told her that I had tried that route and that I had been referred to legal because the recruiter did not know what to do with me.

When a Voluntary Separation Option was on the table for me I asked Lisa Kober if I was eligible for rehire, if I took the package. Lisa told me that I was eligible for rehire, if I took the package. I did not take the package because, upon Lisa's recommendation, I exited Fannie Mae on short-term disability which then turned into long-term disability. I was told at different points during my disability that I was eligible for rehire.

I have read the OFHEO report on Fannie Mae. I had them send a copy with accompanying compact disk to me. Many of the recommendations that I made while I worked at Fannie Mae, recommendations that I was punished for, have now been mandated by OFHEO and the SEC. I hoped that there was a new atmosphere of change within Fannie Mae that would reward new processes, process review, reengineering and the like which I fought so hard to implement. However, I find that it seems the prevailing attitude of disdain is alive and well.

Please forward to me a hardcopy outlining my eligibility for rehire and/or the impediments to my rehire. You may send the information to me at: Ms. Khadija Duma, PO Box 1023, Washington, DC 20013.

Thank you in advance for your cooperation.